**UNITED STATES of America, Plaintiff,**

**v.**

**Leonard L. LEVY, Defendant.**

**Crim. No. 12639.**

United States District Court,
D. Connecticut.

March 12, 1971.

Stewart H. Jones, U. S. Atty., D. Conn., for plaintiff; Cono R. Namorato, Harlow M. Huckabee, John G. Bartels, Sp. Attys., Dept. of Justice, Washington, D. C., of counsel.

Thompson, Weir & Barclay, New Haven, Conn., for defendant; Curtiss K. Thompson, New Haven, Conn., of counsel.

## OPINION and DECISION

LEVET, District Judge.*

The defendant above named was indicted on November 18, 1969 and charged, pursuant to Title 26, United States Code, § 7201, with two counts of wilful attempted tax evasion (1963 and 1964 returns).

The defendant waived a jury trial and the case was tried before the court at Bridgeport, Connecticut on January 18–22, 1971. The transcript was made fully available soon after the completion of the trial. Both parties submitted memoranda, the court heard extensive oral argument on February 17, 1971. I have considered the evidence submitted at the trial, the transcript of the testimony, the exhibits submitted by both defendant and the United States.

The elements of the crime of tax evasion as defined in Title 26 U.S.C. § 7201 necessary to convict a defendant are as follows:

(1) An additional tax must have been due and owing. Lawn v. United States, 355 U.S. 339, 361, 78 S.Ct. 311, 2 L. Ed.2d 321 (1958); Sansone v. United States, 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1964).

(2) The defendant must have attempted to evade or defeat the tax. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1942); Sansone v. United States, supra.

(3) The acts of defendant in (1) and (2) must have been wilful. Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Spies v. United States, supra; Sansone v. United States, supra.

I have no doubt that the United States has proved the first two elements of the charge, i. e., (1) an additional tax was due and owing, and (2) the acts of defendant constitute attempts to evade or defeat the tax for each of the two years involved.

The substantial understatements of taxable income and income tax on the defendant's 1963 and 1964 income tax returns (Ex. 1 and 2 respectively) appear to have been as follows:

### Taxable Income

| Year | Reported | Corrected | Additional |
|------|----------|-----------|------------|
| 1963 | $41,388.61 | $75,432.41 | $34,043.80 |
| 1964 | 29,335.00 | 53,337.45 | 23,982.45 |
| Totals | | | $58,026.25 |

### Income Tax Liability

| Year | Reported | Corrected | Additional |
|------|----------|-----------|------------|
| 1963 | $20,518.95 | $46,179.81 | $25,660.86 |
| 1964 | 11,398.05 | 26,061.97 | 14,663.92 |
| Totals | | | $40,324.78 |

(R. 24–25).

As above indicated, the taxes due were as follows:

| | | |
|---|---|---|
| 1963 — | Amount due | $46,179.81 |
| | Amount paid (upon return) | 20,518.95 |
| | Additional amount due | $25,660.86 |
| 1964 — | Amount due | $26,061.97 |
| | Amount Paid (upon return) | 11,398.05 |
| | Additional amount due | $14,663.92 |

(See Stipulation R. 24)

Counsel for defendant stated at trial that "there will be a stipulation presented to your Honor that was made in March of last year, which disposes of all of the arithmetic in this case. The underpayment of taxes is agreed to." (R. 15) Defense counsel at oral argument confirmed this when he said: "I am bound by the stipulation, there is no question about that."

Thus the stipulation and the evidence submitted by the government clearly demonstrated the falsity of defendant's returns.

### 1963 RETURN

There was evidence that certain receipts from clients paid to defendant in 1963 were not included in his return for that year:

1. $1,000 fee from one Arnold Andrus, paid in cash on November 30, 1963. (Ex. 3; R. 89–91, 228, 229)

---

* Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

**1288**

2. Checks for $250.00 and $50.00 from one Vera Rogers. (Exs. 10, 11; R. 125–129, 230)

3. Check for $125.00 from New Haven Electric Contractors Association. (Ex. 12; R. 130–132, 230)

4. Checks from one John German, Jr., in the amounts of $175.00 and $150.00 respectively. (Exs. 18, 19; R. 133–143, 160, 161, 231)

5. Check from one Reginald Brulotte in the sum of $225.00. (Ex. 22; R. 144–145, 152–156, 231–232)

Defendant in his post-trial memorandum argued that the 1963 payments of sums to him by certain clients, to wit, Andrus, Rogers, New Haven Electric Contractors Association, German and Brulotte in 1963 were not proved to be for fees and might be for other purposes. (pp. 11, 12) There was certain testimony hereinbefore stated, indicating that the payments were for services. It is possible that some of the moneys *may* have been paid for other purposes, but not likely. In any event, none of these facts is indispensable to the determinations I am making herein.

Similar claims are made by defendant as to 1964 payments by Walter Hoffman, Krich Corp. (See Defendant's memorandum, p. 16) As to these payments my comment is the same as for the 1963 payments.

## 1964 RETURN

There was evidence that the following receipts by defendant from clients paid in 1964 were not included in his return for that year:

1. Checks in the amounts of $300.00 and $200.00 paid by one John L. McDonald. (Ex. 4; R. 110, 111, 112, 229)

2. Check in the amount of $1,125.00, dated October 6, 1964, paid by Krisch Corporation. (Ex. 23; R. 202–204, 232)

The proof submitted by the government, among other facts, shows that:

1. The amounts of the understatements of income were substantial (see above);

2. The defendant personally maintained whatever financial records were made of his law office receipts, including the so-called "schedules of deposits," bank statements, cancelled checks, etc. (R. 210–212)

3. Defendant himself supplied the preparers of his 1963 and 1964 tax returns with all relevant information appearing in those returns. (R. 36–38, 48–49, 213–214)

4. Schedules of defendant's deposits for the years 1963 (Ex. 44) and 1964 (Ex. 45) were the records prepared by defendant when he submitted his gross receipts to the persons preparing the returns. (R. 213, 214)

In this regard, Exhibits 46 and 47 are adding machine tapes which total the amounts which were designated as income on the 1963 and 1964 schedules respectively. A comparison of the reported gross receipts to the yearly total of the items designated as income on the schedules of deposits is as follows:

| | 1963 | 1964 |
|---|---|---|
| Items Designated as Income Per Schedules of Deposits (Exs. 44, 45, 46) | $59,745.97 | $38,760.44 |
| Reported Gross Receipts Per Schedule C of Defendant's Tax Returns (Exs. 1, 2) | 45,037.77 | 36,374.00 |
| Difference | $14,708.20 | $ 2,386.44 |

5. Defendant falsely told the special agent that all business receipts were deposits. (R. 212)

In summary, the government at the trial produced adequate evidence in its direct case to prove the first two elements of the charge and hence to raise a prima facie case of Levy's wilfulness based on the presumption of sanity. United States v. Cain, 298 F.2d 934, 936 (7th Cir. 1962).

## WILFULNESS

Both sides conceded that the basic test now applicable in this circuit to the determination of criminal responsibility, in effect, wilfulness, is that set forth in United States v. Freeman, 357 F.2d 606,

622 (2nd Cir. 1966), which reads as follows:

> "Section 4.01 provides that 'A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.' [footnote omitted] For reasons which will be more fully set forth, we believe this test to be the soundest yet formulated and we accordingly adopt it as the standard of criminal responsibility in the Courts of this Circuit."

Dr. Berman, one of the expert psychiatrists who testified for defendant, stated that defendant understood that his conduct was wrong. (R. 433) No one testified otherwise.

Hence, the only issue is whether the government has proved beyond a reasonable doubt that Levy had a substantial capacity to conform his conduct to the Internal Revenue laws relative to the two income tax returns.

Testimony submitted by Levy included the opinions of Dr. Ernest Prelinger, a psychologist, who had administered certain tests to defendant (R. 298–347); Dr. Jules V. Coleman, a psychiatrist, who had treated defendant from the beginning of 1960 to June 1961; Dr. Sidney Berman, a psychiatrist who had treated Levy from June 6, 1961 to the present; and Dr. Jay Katz, another psychiatrist, who had examined Levy on May 29, June 3 and September 18, 1970.

Practically all of the expert testimony of psychiatrists Dr. Berman and Dr. Katz, called by defendant, was based upon statements made by defendant to the psychiatrists either in the course of treatment, as in the instance of Dr. Berman, or upon an examination, as by Dr. Katz.

Dr. Berman, who, as stated above, treated defendant from June 1961 to the time of trial, related a detailed history based upon defendant's own statements.

This history included the suicide of defendant's father when defendant was 11 years of age, the defendant's feeling of being an outcast and inferior, his anxiety and his depression (R. 363, 364), unhappiness at school, his study at Yale where he was intellectually adequate (R. 367), his dependency upon his mother, his Army life as a lieutenant when he was "supported" by the uniform (R. 368), his sexual problems, his law school studies, his marriage at 36 and its deterioration because of sexual inadequacy (R. 369, 370), the sweating of defendant's hands (R. 372), his suicidal feelings (R. 373), his divorce in 1963 (R. 375), his difficult social relationships (R. 376), defendant's unsuccessful campaign for the office of Attorney-General of the State of Connecticut (R. 377), his inability to socialize with other lawyers (R. 378), his "bumping" accidents with other cars (R. 386, 388), two instances of suits against him by clients (R. 386).

Dr. Katz added other factors as follows: The defendant's father's preoccupation with business affairs and absence from home (R. 456), a fishing excursion of father and son, when the son thought the father was bored (R. 457), and lack of affection from defendant's mother (R. 488).

## THE DEFENDANT'S WITNESSES

### 1. Testimony of Dr. Prelinger

Dr. Ernst Prelinger, a psychologist, testified for defendant with respect to the results of three clinical psychological tests, to wit, the Rorschach test, the Wechsler Adult Intelligence Scale and the Thematic Apprehension Test (R. 300–301, 302, 308, 311), administered in July 1970 at the request of Dr. Katz.

The principal diagnostic finding of Dr. Prelinger was that defendant was afflicted with "life-long features" evidencing a "severely borderline, possibly ambulatory, psychotic personality structure." (R. 317)

Other findings of Dr. Prelinger were:

(a) A "highly narcissistic orientation." (R. 321)

(b) Weakness or disruption of his personal identity in the sense of self identity. (R. 321)

(c) Defendant's dependence on external appearances and trappings. (R. 328)

He said defendant's "intellectual potential is very high." (R. 330)

Apparently, Dr. Prelinger obtained little, if any, information about defendant's activities or income as a lawyer. (R. 346, 347, 349) In fact, he stated these factors were of no particular interest to him. (R. 347)

After referring to the "intelligence that he basically has," Dr. Prelinger commented that under certain circumstances "he is liable to come to very ill-judged decisions or actions." (R. 331) "Liable" appears to mean no more than "possible" and, hence, is an uncertain basis for a conclusion or opinion. (See Martin v. United States, 109 U.S.App. D.C. 83, 284 F.2d 217, 218 (1960).

Taking his history from the defendant (R. 343), Dr. Prelinger concluded that the relevancy of defendant's law practice was not decisive (R. 348) but conceded that defendant had no full-fledged psychotic problem. (R. 344)

I have considered the testimony of Dr. Prelinger insofar as it seems relevant and to the extent warranted by his knowledge, experience and training. (See Jenkins v. United States, 113 U.S.App. D.C. 300, 307 F.2d 637, 642–646 (1962). Cf. Brief filed in Jenkins by American Psychiatric Association quoted in "Pursuit of Agreement: Psychiatry in the Law," Jonas B. Robitscher, J. D., M. D., p. 30; and dissenting opinion of Bastian, Circuit Judge, in Jenkins, supra, 307 F.2d, pp. 651, 652).

2. *Testimony of Dr. Coleman*

Dr. Jules V. Coleman, a psychiatrist who treated defendant from the beginning of 1960 through June 5, 1961 (R. 270, 271), testified that as of June 1961 he considered the defendant to be "an extremely anxious, tense, somewhat depressed individual who was having marked difficulties in his marital relationship, with a good deal of conflict and incompatibility." (R. 275)

Although Dr. Coleman termed defendant's condition "a severe psychoneurosis" (R. 275), he admitted this classification was, in effect, the same as "neurosis." [1] (R. 276–277) In a report written on October 15, 1968 (and confirmed at trial,) he had stated that "on the whole he [defendant] was able to maintain self control and self discipline so that his relatively severe emotional problems did not during his treatment with me interfere directly with his work." (Ex. B; R. 282)

Dr. Coleman also conceded that he never administered shock treatments to defendant nor recommended hospitalization, the only medication prescribed being Librium, a mild tranquilizer. (R. 283)

Dr. Coleman's observations were all made at some time prior to the relevant period here. Hence, he was not questioned as to his opinion under the Freeman test.

3. *Testimony of Dr. Berman*

As already stated, Dr. Sidney Berman treated defendant from June 1961 to the date of trial. The history, which he received solely from defendant, has already been mentioned.

Dr. Berman, has the following qualifications (R. 351–356):

Graduated from Yale College in 1939; in 1943 he received his medical degree from Long Island College of Medicine. Thereafter served an internship and residency at Mt. Sinai Hospital in New York City.

Dr. Berman next spent two years in the U. S. Army at Brook Army General

---

1. The Court interprets the term "neurosis" to denominate a disorder of the psychic or mental constitution which, in contrast to a psychosis, is less incapacitating, and in it the personality remains more or less intact. See Dorland's Medical Dictionary (23rd Edition), p. 918.

Hospital in San Antonio, Texas, where he received training at the Army Neuropsychiatric School. He was thereafter transferred to the Percy Jones General Hospital in Battle Creek, Michigan where he served as an assistant chief and later chief of neurology and officer of psychiatry.

After military service, Dr. Berman received further training at the Psychoanalytic Clinic at Columbia University. In 1949 he opened a private office in New Haven and simultaneously began teaching psychiatry at Yale.

Dr. Berman is a diplomate in both neurology and psychiatry and a member of various professional associations.

At the time of trial, he stated that he continues to teach at Yale as an assistant clinical professor of psychiatry and also devotes about eight hours per week to the Yale Student Mental Hygiene Department. The remainder of his time is allocated to private practice.

In Dr. Berman's direct testimony he stated that in his opinion defendant was suffering from a borderline psychotic syndrome, manifested by depression and anxiety (R. 388); that because of defendant's mental illness he did not have the capacity to conform his behavior to the requirements of the law. (R. 393)

He conceded that neither in his grand jury testimony nor in his report of April 26, 1968 had he made any statement that defendant was psychotic (R. 401); that he never had his patient hospitalized or given shock treatments (R. 408), even though he said defendant was suicidal. (R. 384–385)

Dr. Berman stated he was not concerned with the facts relative to defendant's law practice or income therefrom. (R. 438, 465)

Dr. Berman prescribed only Librium. (R. 420, 422)

Although Dr. Berman testified that defendant complained about the disorganization in his life due to his political campaign for election as Attorney General of Connecticut (R. 377), it seems that this related most to defendant's dislike in being on the "stump" and because his wife refused to accompany him. It is difficult to see anything abnormal in such an attitude.

The automobile accidents sustained by defendant, as related by him to Dr. Berman, were trivial, and although Dr. Berman termed them evidence of a suicidal tendency this is subject to some degree of practical doubt due to the nature and limited extent of the collisions. (R. 405, 425, 426)

The two complaints by clients of defendant were not serious and appeared to be essentially acts of inadvertence which might occur with any busy lawyer with a substantial practice.

In Dr. Berman's report to defendant's attorney, dated April 26, 1968, he stated that defendant's main symptoms centered around anxiety and depression in the context of a deteriorating marriage. (R. 400)

Dr. Berman gave no relevance to defendant's activities or income (R. 405, 407) in spite of the fact that he testified before the grand jury that he functioned reasonably well in his activities as an attorney. (R. 408)

Dr. Berman affirmatively conceded that defendant knew his conduct was wrong (the first element of the Freeman rule). (R. 433).

## 4. The testimony of Dr. Katz

Dr. Jay Katz, who testified as an expert psychiatrist, has the following qualifications:

He received an A. B. degree in 1944 from the University of Vermont, did graduate work in chemistry at Columbia University and later attended Harvard Medical School. Upon graduation, he interned at Mount Sinai Hospital in New York City and served as a resident at the Long Island College of Medicine in psychiatry. He next served in the U. S. Air Force as Chief of Psychiatry at Maxwell Air Force Base.

During the period from 1955 through the present, Dr. Katz has been associated

with the Department of Psychiatry of the Yale Medical School.

In 1958, he also became associated with the Yale Law School; he is presently an Adjunct Professor of Law and Psychiatry there.

Dr. Katz examined defendant three times in 1970. He testified that in his opinion at the relevant times defendant suffered from a psychiatric condition which he termed "severe borderline state of ambulatory psychotic—with an ambulatory psychotic structure" and that as a result thereof, defendant was unable to conform his conduct to the Internal Revenue laws. (R. 459–460)

One factor considered by Dr. Katz, not mentioned by the other defense doctors, was defendant's drive to "amass money" and attain financial security. (R. 478, 501)

A pertinent comment at this point is as follows: while this "drive" might well have explained defendant's failure to report his full income, it is lacking in any probative force to demonstrate defendant's incapacity to conform to the Internal Revenue laws since love of money is not a unique trait.

In spite of the fact that Dr. Katz conceded the relevancy of the extent and nature of defendant's income derived from his legal practice (R. 502–503), he, like Dr. Prelinger and Dr. Berman, relied almost entirely on evidence coming directly or indirectly from defendant. (R. 430, 505, 506, 774, 342, 343)

Actually, Dr. Katz assumed on the basis of limited and inadequate information (a) that defendant's contact with his clients was "almost robot-like" (R. 499) and (b) that defendant's practice was confined to "relatively uncomplicated legal matters" (R. 779), whereas the lay testimony adduced by the United States satisfactorily demonstrated otherwise.

The breadth of defendant's successful and lucrative practice belies the adequacy of the assumptions of facts and conclusions on which Dr. Katz gave his

opinion under the second branch of the Freeman Rule.

Dr. Katz stated that in his opinion because of the "severe borderline state with ambulatory psychotic structure" and "because of the underlying psychological difficulties at work," defendant was unable to conform his conduct to that required under the Internal Revenue laws. (R. 460)

Whether or not this opinion parallels the second part of the Freeman Rule, Dr. Berman gave his reasons on pages 462–470 of the record. Among these reasons were the following: "emotional impoverishment" (R. 462); narcissism (R. 463); depersonalization (R. 464); psychosexual problems (R. 465); failure to develop social relationships (R. 468); fear of impotency. (R. 470)

Dr. Katz asserted that "the most important item is that already prior to his father's death (when he was 11 years old) there were beginnings of severe disturbances in Mr. Levy's psychological functioning." (R. 456)

I am not certain how Dr. Katz was able to perceive these disturbances at such a distant time nor to demonstrate how they affected defendant in 1963 and 1964, particularly when he relied principally on defendant's recollection (R. 408) regarding his matrimonial difficulties (R. 472–474), his social ambitions (R. 475–476) and his preoccupation with money. (R. 478, 479)

Apparently, defendant's counsel contends that defendant's desire for monetary security was the "drive" which controlled his behavior in respect to the filing of inadequate returns. (See pp. 46 and 47 of oral argument.)

Although Dr. Berman *listed* certain factors, little if any connection between these factors and defendant's alleged incapacity to conform was demonstrated. Most of these conditions might well be described as the difficulties and disappointments of life, many of which occur to innumerable persons.

The United States, by way of rebuttal, called numerous lay witnesses and then Dr. David Abrahamsen, a psychiatrist.

### The Government's Rebuttal Lay Witnesses

Lay witnesses demonstrated to the Court defendant's ability to practice law in a wide field during the years 1963 through 1965, in a competitive, intelligent and successful fashion.

See the testimony of the following claims adjusters:

Leonard R. Marazzi — Nationwide Insurance Co. (R. 532)
John Galasky — Nationwide Insurance Co. (R. 552)
James McNeil — Travelers Insurance Co. (R. 568)
Peter J. Kelly — Travelers Insurance Co. (R. 576)
James Manix — Allstate Insurance Co. (R. 585)

Comments by those witnesses as to defendant's conduct as an attorney and his general behavior were as follows: fairly capable, likeable, and aware of the technical matters involved (R. 535); competent and mild mannered (R. 554); pleasant, cooperative and intelligent (R. 587).

Further it was stated that the defendant pleaded his client's case in an intelligent manner (R. 583); and, the defendant's behavior was not abnormal nor any different from the average attorney. (R. 570–571.)

Defendant's law practice, in which he was engaged in the relevant period, included the following types of cases:

personal injury cases (R. 82, 83, 623)
criminal cases (R. 116, 560)
divorce cases (R. 111)
child custody cases (R. 127, 140)
zoning matters (R. 150)
probate cases (R. 253)
workmen's compensation cases (R. 609)

Similar testimony was supplied by the following:

*William Harlow,* an attorney, who referred a number of personal injury cases for trial, to Levy (R. 521–531);

*Judith Ludoviconi,* defendant's secretary (R. 592–600);

*Irving Schwartz,* an attorney and Clerk of the Sixth Circuit Court in New Haven, who described defendant as an active practitioner (R. 558–666);

*Hon. Anthony E. Grillo,* a Judge of the Superior Court, State of Connecticut, and who was formerly a Workmen's Compensation Commissioner before whom defendant practiced successfully in 1959–1965 (R. 607–620).

Other government witnesses related their knowledge of defendant's activities in civic enterprises as follows:

*Earl Williams,* a lawyer and an officer of the New Haven branch of the National Association for the Advancement of Colored People when defendant was a director (R. 621–629);

*Josephine Katz,* Executive Director of the New Haven County Chapter of the National Foundation, March of Dimes, with which defendant was connected for ten years as an executive board member (R. 545–551).

### Testimony of Dr. Abrahamsen

Dr. David Abrahamsen received his Medical Degree at the Royal Frederic University in Oslo in 1929. (R. 635) He received his psychiatric and neurological training at the University and Municipal Hospital in Oslo, Norway, in Denmark and in England. (R. 435) Until 1940 he worked as a psychiatrist in the Department of Justice in Oslo, coming to the United States in 1940 after the Germans invaded Norway. (R. 435)

In the United States he worked at St. Elizabeth's Hospital (Washington, D. C.) and at various other hospitals, at the Illinois State Penitentiary, at Menninger Clinic, at Bellevue Hospital, at the Department of Psychiatry at Columbia University, and in the Department of Mental Hygiene at the State Psychiatric Institute. (R. 635, 636)

Dr. Abrahamsen is a Diplomate in Psychiatry of the American Board. (R. 636)

His research and staff activities included an appointment as research associate at Columbia University; an appointment by Governor Dewey to conduct a study of sex offenders at Psychiatric Institute in New York City and

at Sing Sing Prison, from which a report was made to the State Legislature. (637)

Other similar appointments were: Consultant to the Department of Mental Hygiene, State of New York; member of the Commission appointed by Governor Harriman to study the problem of legal insanity; reappointment to that Commission by Governor Rockefeller, with reference to new law on legal insanity in New York (637), similar to the American Law Institute test and working with Professor Wechsler and three other members of the legal professions and one other psychiatrist. (638)

Dr. Abrahamsen has published eight or nine books in the field of psychiatry and crime, among which were Crime in the Human Mind, Who Are Guilty, and The Psychiatry of Crime. (639) Certain of these books have been translated into other languages. (640)

Dr. Abrahamsen is a practicing psychiatrist in New York City. (645)

Pursuant to an order of this court, Dr. Abrahamsen examined defendant on January 20, 1971. He also read the transcript of this trial for January 18, 19, 20 and 21, 1971, and while in court heard testimony given prior to his own on January 22, 1971. (642)

. He described the history which he obtained from defendant (643–650), the financial aspects of defendant's law practice (654), etc.

In his opinion, Dr. Abrahamsen concluded:

(1) That defendant had no mental disease or defect on April 15, 1964 or April 15, 1965 (the dates of the filing of the respective returns). (661, 662)

(2) That defendant did not lack substantial capacity to appreciate the wrongfulness of his conduct at that time. (662)

(3) That defendant did not lack substantial capacity to conform his conduct to the requirements of the law during that time. (663)

His diagnosis was that defendant's condition was that of "anxiety reaction,"

which he had had for many years. Yet, in spite of his poor environment, he was able to get along. Dr. Abrahamsen said he found no "psychotic" trait in him. (664–665) Dr. Abrahamsen gave extensive reasons for this opinion. (665–676) I believe his reasoning is persuasive.

■ Defendant contends that Dr. Abrahamsen was biased, that his opinion was foreordained, that he was a professional witness for the government and had testified on many occasions for the government on similar issues. I have considered these suggestions but I am not persuaded that Dr. Abrahamsen departed from a professional standard in the rendition of his opinion.

In no way do I wish to belittle the testimony of the psychiatrists who testified for defendant in this case. As stated in substance by Circuit Judge Bastian, dissenting in Jenkins v. United States, supra, sincere and experienced psychiatrists take the stand and differ diametrically as to whether or not the defendant had a mental disease or defect at the time he committed the crime charged against him.

Consequently—

(1) The opinions from defendant's psychiatrists were based primarily, if not entirely, on what defendant chose to tell them, and in part these opinions disregarded defendant's successful professional career during the relevant periods;

(2) Many of the alleged causes of mental disturbance appear to have been over-emphasized and, in general, to be little more than the personality traits of an inadequately adjusted lawyer who may have been disturbed by his youthful problems and perhaps later by poor marital and social relationships, with some indication of an unreasonable regard for the importance of money. Nevertheless, defendant was clearly intelligent and professionally successful;

(3) While defendant's psychiatrists attempted to explain personal character-

istics of the defendant, they did not in my judgment demonstrate convincing reasons why such personality problems caused a lack of capacity to conform his conduct with the Internal Revenue laws.

On the other hand, I am convinced by the lay testimony relative to defendant's professional conduct, his practice, his civic relationships and his financial success that the government has proved beyond any reasonable doubt that defendant's conduct was wilful and that he was able to conform his conduct to the requirements of the Internal Revenue laws. This result is strengthened and confirmed by the testimony and opinion of Dr. David Abrahamsen, a psychiatrist. Altogether I am convinced beyond a reasonable doubt that defendant did not have any mental disease or defect which resulted in the lack of substantial capacity to conform his conduct to the requirements of the Internal Revenue laws.

In United States v. Freeman, 357 F.2d 606 (2nd Cir. 1966) Circuit Judge Kaufman made the following comments:

"* * * At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psychiatrists— much like experts in other fields— should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his potentialities, his capabilities. But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts. In so deciding, it cannot be presumed that juries will check their common sense at the courtroom door. As Professor Wechsler has rightly commented, 'It's not to be expected that juries will lightly accept the proposition that one who seemingly

knew in a true sense did not know. One would expect jury skepticism and the system is the healthier for that jury skepticism.' [Footnote omitted]" (619–620)

"* * * It seems clear that a test which permits all to stand or fall upon the labels or classifications employed by testifying psychiatrists hardly affords the court the opportunity to perform its function of rendering an independent legal and social judgment. [Footnote omitted]" (622)

"* * * Expert testimony, in short, will be admissible whenever relevant but always *as* expert testimony— and not as moral or legal pronouncement. Relieved of their burden of divining precise causal relationships, the judge or jury can concentrate upon the ultimate decisions which are properly theirs, fully informed as to the facts." (623)

An eminent psychiatrist, Dr. Seymour L. Halleck, of the University of Wisconsin, in his book, Psychiatry and the Dilemmas of Crime, has commented significantly as follows:

"* * * No matter how we define antisociality, we will find many people who fit the definition but never commit a crime. We can mention three other serious objections to this approach.

"Antisocial behavior may be easier to measure than criminality, but it must be remembered that antisociality is also an arbitrary, moralistic concept, the definition of which must be dependent upon the value judgments of the investigator. * * *" (p. 4)

"The criminological theorist is faced with an almost insurmountable task. If he adheres to legalistic definitions of crime, he must formulate theories which explain such variant behaviors as murder, embezzlement, treason, failure to pay income taxes, sodomy and adultery. On the other hand, if he eschews legalistic definitions and elects to look upon crime as a form of anti-

sociality, he can approach his task more systematically but must face the possibility that the subjects whom he studies will not always be law violators. The theoretical criminologist has never found a satisfactory resolution of this dilemma.

"Many criminologists have failed even to acknowledge the existence of the problem. They have viewed crime as a legally defined behavior but have nevertheless attempted to explain it with a single theory. Their explanations have· usually been based upon knowledge borrowed exclusively from one other field such as biology, psychology or sociology. This approach not only fails to explain adequately the diverse phenomena of crime, but it has also resulted in a fragmentation of the field of criminology. Too often the study of crime causation has been limited by a situation in which we have either a biological criminology, a psychiatric criminology or a sociological criminology and in which each approach ignores the knowledge available in the disciplines of the others." (pp. 5–6)

## DEFENDANT'S CONTENTIONS

Other contentions of defendant which he claims require an acquittal because of failure of the government's proof are as follows:

■ 1. Defendant objected to the submission of Dr. Berman's Grand Jury testimony to Dr. Abrahamsen. This criticism, however, was not appropriate due to the fact that Dr. Berman was called to testify for defendant at trial. Moreover, Dr. Abrahamsen testified that his opinion would be the same without the Grand Jury testimony. There was no error in the government's position as to turning over the Grand Jury testimony of Dr. Berman. (See Mims v. United States, 375 F.2d 135 (5th Cir. 1967))

The memoranda of Edward Brogan related only to his interviews with defendant. Brogan testified at the trial and defendant produced no proof of any variation between his memoranda and his testimony. The same may be said of the memoranda of others submitted by the government.

Pursuant to the decision of United States v. Baird, 414 F.2d 700 (2nd Cir. 1969), this court, upon appropriate application of the United States, granted an order dated January 18, 1971 for the examination of defendant by Dr. Abrahamsen. Both United States and defense, by said order, were permitted to make available before the examination any relevant material. The defendant was protected by the following portion of the order:

"ORDERED that in the event of subsequent trial testimony by Doctor Abrahamsen, his testimony shall be limited to criminal (mental) responsibility and he shall not divulge at the trial any statement made by the defendant in the course of the examination bearing on the issue of the defendant's guilt or innocence of the offenses charged: * * *"

Immediately prior to the examination of defendant by Dr. Abrahamsen, the court, on January 20, 1971 made the ·following comments to defendant. The court prefaced its remarks with a statement to defense counsel that he should feel free to object if he deemed the questions or comments of the court inappropriate. Concisely stated, defendant was told (R. 433–444):

(1) That after the examination, Dr. Abrahamsen would testify against Mr. Levy;

(2) That Mr. Levy did not have a privilege to refrain from answering the questions posed to him;

(3) That Dr. Abrahamsen could not testify as to the guilt or innocence of the alleged offense and that his testimony would be limited to the issue of criminal responsibility.

■ 2. Defense counsel (oral argument, p. 21) pointed out that defendant estimated his 1964 tax as more than the actual amount eventually required and

that this indicated a lack of wilfulness. On the other hand, in view of the proof of a substantial underpayment, it may as well be taken as a realization that his return should have accounted for the full amount rather than lesser receipts.

■ 3. Defendant at oral argument (p. 26) and in his memorandum after trial contended that there were errors in the adding machine tapes utilized by Brogan, the agent. I find no evidence of substantial error.

## SOME OF THE WELL-ESTABLISHED LEGAL PRINCIPLES AFFECTING THE DISPOSITION OF THIS CASE ARE AS FOLLOWS:

### I.

■. The government's burden to prove the defendant's sanity beyond a reasonable doubt does not arise until "some evidence" is introduced that will impair the legal presumption in favor of sanity. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895). Thus, in order to raise the issue of insanity at all, defendant had the burden of producing some evidence sufficient to raise a doubt that, as a result of mental disease or defect, he lacked substantial capacity to appreciate the wrongfulness of his conduct or conform it to the requirements of law. United States v. Currier, 405 F.2d 1039, 1042 (2nd Cir.), cert. denied 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 849–850 (1962).

### II.

" * * * [O]ne of the most generally accepted rules in all jurisprudence, state and federal, civil and criminal, is that the questions of the credibility and weight of expert opinion testimony are for the trier of facts, and that such testimony is ordinarily not conclusive even where it is uncontradicted." Mims v. United States, 375 F.2d 135, 140 (5th Cir. 1967), and note 2, p. 140. See also Hightower v. United States, 117 U.S. App.D.C. 43, 325 F.2d 616, 619 (1963).

### III.

■ The issue of insanity, when raised as a defense in a criminal case, should be determined from all testimony, both lay and expert. Mims v. United States, 375 F.2d 135, 143 (5th Cir. 1967); McDonald v. United States, 114 U.S.App. D.C. 120, 312 F.2d 847, 861 (1962).

### IV.

"Lay testimony can be sufficient to satisfy the prosecution's burden even though there is expert testimony to the contrary. [Citations omitted]" Dusky v. United States, 295 F.2d 743, 754 (8th Cir. 1961). See also United States v. Cain, 298 F.2d 934 (7th Cir. 1962), which, like the present case, involved an attorney.

### V.

The real value of expert testimony in these cases is "in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in [the] mere expression of a conclusion." Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608, 617 (1957); Mims v. United States, 375 F.2d 135, 143 (5th Cir. 1967).

### VI.

The trier of the facts "may, of course, reject expert opinion" if he finds that "the opinion was based on an incorrect view of the facts. See Mason v. United States, 8 Cir. 1968, 402 F.2d 732, 737; Mims v. United States, supra, 375 F.2d at 143." United States v. Ingman, 426 F.2d 973 (9th Cir. 1970).

As pointed out in the Mims opinion, supra:

"There is no good reason to make an exception for expert opinion evidence on insanity. It is just as subject to error as expert testimony on other matters. Psychiatry itself has progressed rapidly; but it is still a comparatively young profession dealing,

not with an exact science, but with a controversial and rapidly developing one. In addition, the psychiatrist and the jury in a criminal case where insanity is an issue are concerned with entirely different questions. The psychiatrist deals with the question of the defendant's behavior problems from a clinical standpoint in an atmosphere of a physician-patient relationship. On the other hand, a jury is charged with the duty of determining from the evidence admitted in an adversary proceeding the broader question of the criminal responsibility of the accused. That issue includes the questions not only of whether the defendant had a mental defect or disease at the time of the alleged offense, but also of whether any such defect or disease, if found to exist, met the legal test of insanity, as an accused may have a mental disorder or deficiency and in some cases still be mentally competent to be held legally responsible for his crime." Mims v. United States, 375 F.2d at 141–142 and cases cited in notes 4, 5, 6, 7, 8, 9 and 10.

## VII.

The testimony of lay witnesses is proper when confined, as it was in this case, to observations gleaned in their contact with Levy. Mason v. United States, 402 F.2d 732, 738 (8th Cir. 1968), cert. denied 394 U.S. 950, 89 S.Ct. 1288, 22 L.Ed.2d 484 (1969). The general rule, sustained by most of the cases, seems to hold that any and all acts, conduct, declarations, spoken words, appearance and manner of speech of the person involved are relevant. Mason v. United States, supra, quoting 1 Conrad, Modern Trial Evidence, § 123, pp. 124–125.

## VIII.

" * * * [E]xpert opinion on competency rises no higher than the reasons on which it is based and it is not binding upon the trier of facts. Feguer v. United States, 302 F.2d 214, 236 (8 Cir. 1962), cert. denied 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110." Blackmun, Circuit Judge, in Hodges v. United States, 408 F.2d 543, 555 (8th Cir. 1969). See also Dusky v. United States, 295 F.2d 743, 754 (8th Cir. 1961).

For the foregoing reasons I conclude [2] that the United States has proved beyond a reasonable doubt the following with respect to defendant's 1963 and 1964 returns:

1. A substantial tax was due and owing;

2. The defendant attempted to evade or defeat the tax by failing to report substantial amounts of income;

3. The acts of defendant in filing the said returns were wilful;

4. The defendant did not as a result of mental disease or defect lack capacity to appreciate the wrongfulness of his conduct; he knew it was wrong;

5. The defendant did not, due to a mental disease or defect, lack substantial capacity to conform his conduct to the requirements of law. He was fully able to conform his conduct to the requirements of the Internal Revenue laws.

Therefore, I conclude that the United States has proved defendant guilty beyond a reasonable doubt on count 1 and count 2 of the indictment.

---

2. Defendant did not request findings of fact (see Rule 23, Federal Rules of Criminal Procedure).