Donald E. MARTIN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15444.

United States Court of Appeals
District of Columbia Circuit.

Argued April 13, 1960.

Decided June 23, 1960.

Mr. Charles H. Burton (appointed by this court), Washington, D. C., for appellant.

Mr. Harry T. Alexander, Asst. U. S. Atty., with whom Mr. Oliver Gasch, U. S. Atty., and Mr. Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before PRETTYMAN, Chief Judge, and FAHY and DANAHER, Circuit Judges.

PRETTYMAN, Chief Judge.

Appellant Martin was indicted for the illegal possession and sale of narcotics. Upon motion of his counsel (court-appointed) he was committed to the D. C. General Hospital for examination as to his mental competency. The report being that he was psychotic and incapable of assisting in his own defense, he was committed to St. Elizabeths Hospital. Five months later he was certified as competent to stand trial, and he was tried, convicted and sentenced. The present appeal is, upon appellant's pe-

tition and an order of this court, at Government expense.

The problems posed here concern the defense of insanity to a criminal charge. Martin says the evidence required the judge to direct a judgment of acquittal by reason of insanity, and says that the judge also erred in his instructions to the jury.

There was little or no doubt of Martin's guilt, apart from the issue of insanity. He made two sales of narcotics to an officer in the Metropolitan Police Department, working under cover. The evidence was direct and precise as to detail.

■ The real dispute concerns the issue of insanity. We consider first whether, when both sides had rested, the evidence presented a question for the jury upon this issue. Martin's prior history was shown in some detail. This is as it should be. We have pointed out in other opinions [1] that the material from which an expert fashions his opinion constitutes one of the most important features—if, indeed, not the most important feature—of expert testimony. Martin was born out of wedlock. At four years of age he was taken into the home of a person variously described as a foster mother or a godmother. This woman seems to have had high ambitions for the boy. She sent him to a private school in Andover, Massachusetts, and to a summer camp in Pennsylvania. Up to this point, at almost seventeen years of age, he did well. Then he refused to return to Andover, and she put him in a private high school in Washington. He was expelled for fighting and then was expelled successively from two public high schools. At about that time he began to live part of the time with his natural mother in Baltimore. In his brief here he recites testimony to the effect that his mother's associates were quite different from his godmother's standards. He went into the Air Force, ran away, and, after a short period in a mental hospital, was released with a bad-conduct discharge. The medical report in the Air Force was "emotional instability reaction, chronic, severe." He went back to his mother in Baltimore and became involved in a number of "anti-social activities". He "got with a bunch of fellows", and they wandered over the country. He knew their nicknames—Car, Bolt and Huss. "[T]hey were addicts too," and "[m]ost of them are in jail now." He gambled a lot. "I always cheat." In the early part of 1958 he was using heroin—"to the extent of all I could get"—"sometimes my shot would be 10, 11 of them at a time." He could not keep a job and repeatedly got into trouble with the police. He was restless and nervous, sweating heavily at night, and thought people were against him.

Four psychiatrists and a psychologist testified for Martin, and the Government called two psychiatrists. All were questioned about the presence *vel non* of a mental disease and about the causal connection between the disease, if any, and the alleged criminal act, *i.e.*, the sale of narcotics.

■ The terms "probable" and "possible" occur frequently in this testimony. And this is often necessarily so from the viewpoint of experts. In many fields, of which medicine, nuclear physics, and oftentimes unexplained accidents are examples, the utmost that the best of scientists can say is that such-and-such is "probable" or is "possible". But when it comes to translating that testimony into findings of fact, which is the duty of a judge or a jury, we have another problem. What is probable as a scientific fact may under some circumstances be a consideration in the finding of a fact. So the "probable" may be admissible and may be considered. What weight the merely probable should be given is a serious and delicate problem. Certainly such testimony is short of direct assertion. But what is merely possible is not a basis for finding a fact. A person perfectly well today may possi-

1. E. g., Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608 (1957).

bly be ill tomorrow or may possibly have been ill last month. Of course an opinion that a certain something is possible may be, and frequently is, useful and of probative value as a buttress to a flat assertion that the something is a fact. Such is frequently the case where the issue of fact lies in an area of doubt; for example, blood tests in a paternity case. And assertions that a thing or act is possible may be useful, and admissible, as a response to an opponent's assertion that the thing or act is impossible. But mere possibility is not an affirmative basis for a finding of fact. In the language of the law of evidence, that which is merely possible, standing alone and not offered as auxiliary or rebuttal testimony, is immaterial to the ascertainment of the fact and so is inadmissible as evidence of that fact. So, if an expert scientist can say only that such-and-such is possible, he has done the best he can do from the scientific point of view, but from the standpoint of the law such testimony does not permit the finder of fact to say that such-and-such is actually a fact.

The expert testimony in this case was not uniform. The alleged offenses occurred in March, 1958. Dr. McIndoo, the first expert called by the defense, said that in July, 1958, the doctors who examined Martin at D. C. General Hospital made a diagnosis of "schizophrenic reaction; paranoid type." Asked as to Martin's condition in March, 1958, Dr. McIndoo replied, "He was addicted to heroin." She testified: "I have no specific way of knowing what his mental condition was in March." It was possible, or probable, she said, that he was suffering from a sociopathic condition or a psychoneurotic condition at that time. She said that the alleged criminal acts were "[n]ot directly" the product of the mental condition from which Martin suffered. She later said, as to a mental disease at the time of the offenses, "I cannot answer yes or no. I can say it is possible." And she said the causal connection was "possible".

Dr. Platkin, called by Martin, said that in August, 1958, he diagnosed Martin's condition as "sociopathic personality disturbance, antisocial type", a mental illness. He believed Martin had been suffering from that disease in March. Asked whether the alleged acts were the product of the disease, Dr. Platkin said: "I believe they probably were, in as far as I can go in forming a concrete definite opinion." Dr. Holt, called by Martin, was one of a conference of doctors who examined him in January, 1959. Dr. Holt found Martin "to be suffering from psychoneurotic reaction; mixed type; with anxiety and depressive features." He said Martin was so suffering in March, 1958. Asked as to the causal connection between this disease and the alleged criminal acts, Dr. Holt said: "I would have to say on that I am not sure." Asked whether there was a strong probability he first said, "There is." However he later said, "I would say slightly less than strong."

In his turn at rebuttal, after the Government's rebuttal, Martin presented as a psychiatrist Dr. Kushner, who had observed Martin in group therapy at St. Elizabeths. He said that at the time of his observations, over a period toward the end of 1958, Martin was suffering from a psychosis, which he described as a schizophrenic reaction, paranoid type. In response to hypothetical questions Dr. Kushner said the stated symptoms would indicate Martin was suffering from this disease in March. Asked as to causal connection he replied: "Then if these facts were true, it would be my opinion that he was psychotic at the time and, therefore, a crime committed at that time would of necessity be a product thereof."

The psychologist called by Martin testified that his report showed "this man must be considered psychotic, with a diagnosis of schizophrenic reaction, catatonic type."

In its rebuttal the Government called two psychiatrists. The first, Dr. Coty, testified that in his opinion at the time

of his examination, in the period from August, 1958, to January, 1959, Martin was without mental disorder. Prior to that time there were evidences of personality disorder. He had no firm opinion as to Martin's mental condition as of March, 1958. From the information at hand he thought Martin had undergone "an episode of mental illness" which apparently began while he was in D. C. General. The second doctor called by the Government was Dr. Owens. He first examined Martin in August. He said the patient was suffering from a sociopathic personality disturbance, which he said is a mental illness. He did not think Martin was psychotic while at St. Elizabeths. The inability of an addict to obtain drugs could, he said, "trigger" a person like Martin into a psychosis. He said there was probably no connection between the alleged criminal acts and the mental illness; "that the likelihood is that there is no connection."

■■ This, then, was the situation when Chief Judge Pine came to rule upon the motion for a judgment of acquittal by reason of insanity. He discussed the matter out of the hearing of the jury. He correctly stated the problem to be whether reasonable men must necessarily have a reasonable doubt as to Martin's sanity in the light of the evidence before them.[2] The judge noted that almost the entire testimony, especially that concerning causal connection, related to "probabilities". He discussed the last statement of Dr. McIndoo as to causal connection and the testimony of Dr. Owens. Judge Pine concluded that he could not say all reasonable men should ignore Dr. Owens's testimony that there probably was no causal connection or Dr. McIndoo's statements that a mental disease in March and any causal connection between mental disease and the criminal acts alleged to have been committed by Martin were "possible". Judge Pine ruled that a jury question was presented.

We cannot say the ruling of the trial judge was error. The testimony was fraught with "possibilities" and "probabilities". There was no direct evidence on the causal connection point, except that of the doctor who said Martin had a mental disease and that "therefore * * of necessity" the criminal acts were the product. In this problem the nature of the criminal acts must be kept in mind. Here they were sales of narcotics. The question is whether sales of narcotics were the product of whatever mental disease Martin may be said to have had. The trial judge and the jury saw and heard the experts, observing the certainty or lack of certainty in their expressions of opinion and absorbing the whole atmosphere, demeanor, inflections, etc., of the giving of the testimony. They saw and heard Martin, who took the stand. The picture drawn by the prior history is clear. We cannot say that as a matter of law, upon that history and the inconclusive views of the experts, there must be in the minds of all reasonable men a reasonable doubt of his sanity. We cannot say on the record as we find it that reasonable men must necessarily have found one way or the other. This is to say there was a jury question.

We turn, then, to the charge of the court to the jury. We find no error in it. The judge gave all the essential general instructions. He then instructed on expert testimony. On the subject of insanity he was succinct, clear and correct. He briefly sketched the testimony of the experts. He made clear, without complicating it, the rule laid down in the Davis case[3] by the Supreme Court, that, in a case where evidence of the sort here offered by the defendant was received, the burden was upon the Government to prove the sanity of the accused beyond a reasonable doubt. He repeated that instruction several times. He correctly stated in clear terms the concept laid

2. Curley v. United States, 81 U.S.App. D.C. 389, 160 F.2d 229 (D.C.Cir.), certiorari denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

3. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

down by this court in the Durham case[4] as to the determination of mental responsibility for crime. He instructed in considerable detail upon the more difficult phases of the problem, including the matter of causal connection between the mental disease, if any, and the alleged criminal acts. The charge is too long to quote here in full. We find no error in these instructions. Martin, lifting a sentence or so out of context, says they were confused. Keeping in mind the difficulties inherent in the subject matter the judge was explaining, and considering the charge as a whole, we find no confusion. The judgment is

Affirmed.

---

4. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (D.C.Cir. 1954).

