Robert STACK, Appellant,

v.

UNITED STATES, Appellee.

No. 84--1101.

District of Columbia Court of Appeals.

Argued Feb. 4, 1986.
Decided Dec. 17, 1986.

Mark Rochon, Public Defender Service, with whom James Klein and Mark Carlin, Public Defender Service, were on the brief, for appellant.

Daniel S. Seikaly, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Thomas J. Tourish, Jr., and Charles S. Leeper, Asst. U.S. Attys., were on the brief, for appellee.

Before MACK, TERRY, and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellant Robert Stack was indicted for the second degree murder, D.C.Code § 22–2403 (1981), of Helen Bataineh, who died on June 8, 1983, as a result of a subdural hematoma. According to the government's theory, Stack caused the fatal hematoma when he struck Bataineh in the face on June 6, 1983. Stack's defense was that he struck her in self-defense and that the government had failed to establish a sufficient nexus between his action and her death one and one-half days later. The jury found him guilty of the lesser included offense of voluntary manslaughter, D.C. Code § 22–2403 (1981). On appeal, he seeks reversal of his conviction on the grounds that: (1) the *in limine* limitation of cross-examination of a key government witness violated his Sixth Amendment right to confront witnesses; (2) the jury instructions failed to present fairly the defense theory in violation of his right to a fair trial; (3) the admission of the videotaped deposition of a key government witness, who the government failed to show was unavailable to testify at trial, violated his confrontation rights and Super. Ct. Crim.R. 15; and (4) there was insufficient evidence his blow was the cause of death. We agree that Stack's first and second contentions require reversal. We also agree that the trial court erred in ruling that a key government witness was unavailable; however, in view of our disposition, we need not decide whether the error was harmless beyond a reasonable doubt. Finally, we hold there was sufficient evidence of causation; accordingly, we reverse and remand for a new trial.

## I

On the morning of June 6, 1983, while on his way to the hospital for treatment, Robert Stack stopped at James Vaughan's house where his girlfriend, Rita Morris, lived. Helen Bataineh, the decedent, who sometimes stayed with Morris, was lying on the living room couch. Stack initially remained outside of the house, then went inside, and an altercation developed between him and Bataineh. Bataineh, who had been drinking since the night before, brought two large German Shepherds into the house and went towards Stack with the dogs. Stack was terrified and yelled for Morris' help. One dog went under a table; Morris took the other dog outside. When Morris returned, she saw Stack take a full swing and slap Bataineh across the left side of the face. The blow knocked Bataineh to a sitting position on the floor. Stack then kicked her twice in the left rib; Bataineh looked dazed. Stack stopped hitting Bataineh after Morris told him to "stop hitting her, you're going to kill her." He and Morris then left for the hospital. Later that morning, Stack said to Morris, "I guess [Bataineh's] head hurts now."[1]

Around one p.m. Bataineh called a neighbor and the police to report the assault. Officer Lantz testified that Bataineh said she thought some of her ribs were broken. Lantz observed that it was difficult to get information from Bataineh because she lost track of her thoughts easily, although she did not appear to be intoxicated.

An ambulance took Bataineh to Capitol Hill Hospital where she told the emergency room nurse that she had been kicked in the neck and ribs, but did not mention being hit in the face. The examining doctor found no localized tenderness in the neck or bruises or welts in the head or neck, and noted in the medical record "no head trauma." Chest x-rays revealed five of the eight ribs on Bataineh's left side were broken. No x-rays or other tests were ordered for her head.

James Vaughan brought Bataineh home from the hospital on June 6 about 7 p.m. That evening he noticed a bruise on the left

---

1. After Bataineh's death, Stack told Morris not to tell the police he had gone inside Vaughan's house on June 6.

side of Bataineh's face.[2] He and Bataineh remained in the house until the next morning, when Bataineh told Vaughan she felt terrible, but was going to work.

Blair Middleton, for whom Bataineh worked as a live-in nurse's aid, recounted Bataineh's activities and deteriorating physical condition during the next two days.[3] Joan Park, a cousin of Middleton's who was staying with him at the time, also described Bataineh's behavior during this period. Park testified that on June 7 Bataineh was moving slowly at 8 a.m. and claimed she had been beaten up over the weekend and felt lousy. The next morning, she was still moving slowly, and saying that she did not feel well. She did not do any of the things she normally did in the morning. In addition, her manner of speaking was slow and "sort of drowsy." Park did not see Bataineh again until after 7:00 when she went upstairs to Bataineh's bedroom. Bataineh was lying on her stomach, breathing heavily, and Park thought she was sleeping. About an hour later, Park thought Bataineh felt slightly feverish. Less than half an hour later, Park could not hear any breathing and found Bataineh's body was cold. Middleton told Park to call the police. Bataineh was pronounced dead at 10:57 p.m. that evening.

The government called two expert witnesses, Dr. Michael Bray, who performed the autopsy, and Dr. Vernon Armbrustmacher, who reviewed the medical records, autopsy report, and a tape recording of Bataineh's voice. The doctors testified that Bataineh's death was caused by a subdural hematoma[4] on the right side of her brain: the hematoma had swollen and compressed the brain, eventually causing a hemorrhage within the brain stem which resulted in death. In their opinion, the trauma which had caused the hematoma could have occurred between one and four

days before Bataineh's death. Dr. Bray testified, to a reasonable medical certainty, that the hematoma was consistent with a punch or a kick to the neck on the afternoon of June 6. He estimated that the trauma which caused the hematoma could have occurred as late as 10 p.m. on June 7. Dr. Armbrustmacher testified, in response to hypothetical questions which recounted Bataineh's activities from June 6 until her death, that, to a reasonable medical certainty, the slap to Bataineh's face on June 6 was "very consistent" with the type of event required to cause the fatal hematoma. Dr. Armbrustmacher thought that the evidence Bataineh was drowsy on June 8 was an ominous sign of increasing intracranial pressure. Both doctors opined that the bruise on the lower left side of Bataineh's jaw, close to her chin, occurred at approximately the same time as the trauma which caused the hematoma. They agreed, however, that a fall or any event causing a sudden, sharp rotation of the head could result in a fatal hematoma. Because of Bataineh's history of heavy drinking, they expressed caution about ascribing any particular injury as the cause of the hematoma, although neither doctor found any evidence of the type of bruises or scrapes which are usually seen when an intoxicated person falls down the stairs.

The defense expert, Dr. Richard Lindenberg, testified that the fatal hematoma was less than two and a half days old and could have begun to form as little as four to six hours before Bataineh's death. In his opinion, the autopsy report was more consistent with evidence that Bataineh had fallen on June 8, and the fall had caused the hematoma, than with evidence that Stack's slap on June 6 had caused the hematoma. He based his opinion on the absence of edema[5] (an indication of age of the injury) in the

---

**2.** Vaughan was not positive which side of Bataineh's face was bruised.

**3.** Middleton testified by videotaped deposition over defense objection. *See infra* Part IV.

**4.** A subdural hematoma is a collection of blood, either liquid or clotted, which displaces the brain, causing breathing to stop.

**5.** An edema is an abnormal accumulation of serous fluid.

brain, the absence of a notation in the hospital records of head or facial bruises on June 6, and the fact that Bataineh was able to go to work on June 7 and perform the tasks associated with grocery shopping and meal preparation. On cross-examination, Dr. Lindenberg admitted that the bruise on Bataineh's chin might have been covered by make-up, and that Stack had not told him Vaughan had claimed to have seen the bruise on the night of June 6 or his (Stack's) slap of Bataineh's face had knocked her off her feet.[6]

The defense also called James Calloway, a tenant in Vaughan's house. He testified that when he came home around ten o'clock at night, Vaughan had told him that Bataineh had been beaten by Rita Morris' boyfriend, Frank. Calloway did not notice any injuries on Bataineh's body.[7] He saw Bataineh sitting on the floor, and testified that she may have been drinking, and had complained her back hurt. Stack did not testify.

### II

Stack contends first that he was denied his Sixth Amendment right to confront witnesses when defense counsel was not allowed to cross-examine Vaughan about his assaults of Bataineh prior to June 5, 1983. He argues the trial judge thereby impermissibly limited cross-examination which would have shown Vaughan's bias and motive to fabricate.[8]

A criminal defendant has a Sixth Amendment right to confront and cross-examine government witnesses. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105,

1109, 39 L.Ed.2d 347 (1974); *Lawrence v. United States,* 482 A.2d 374, 376 (D.C. 1984). If the trial court limits that right, and if an error of constitutional magnitude is found, the appellate court must determine whether reversal is required, *see, e.g., Davis v. Alaska, supra,* 415 U.S. at 318, 94 S.Ct. at 1111; *Springer v. United States,* 388 A.2d 846, 857 (D.C.1978), or whether the error was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See Delaware v. Van Arsdall,* —— U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see also Lawrence, supra,* 482 A.2d at 378. Once a trial judge has allowed enough cross-examination on an appropriate issue to satisfy the Sixth Amendment, limitation of further cross-examination will be reviewed for abuse of discretion. *See Goldman v. United States,* 473 A.2d 852, 856 (D.C.1984); *Springer, supra,* 388 A.2d at 854. Implicit in this standard is an evaluation of the importance of the subject matter and the witness whom the defendant seeks to cross-examine, measured against the degree of cross-examination permitted. Where the proffered testimony of a witness establishes an element of the offense or affects the core of the defense, the court is more likely to find constitutional error if cross-examination is severely limited on that issue. *See Lawrence, supra,* 482 A.2d at 377; *Goldman, supra,* 473 A.2d at 857–58; *Springer, supra,* 388 A.2d at 855–56.

The government argues that this case is indistinguishable from *Beale v. United States,* 465 A.2d 796 (D.C.1983), *cert. de-*

---

**6.** Vaughan did not mention the bruise on Bataineh's chin to the police or to the grand jury. He first mentioned it ten months after Bataineh died while he was being interviewed by a prosecutor. Vaughan testified that the prosecutor was the first person to ask about a bruise.

**7.** Defense counsel also attempted to show that Vaughan had tried to influence Calloway's testimony.

**8.** The government contends the bias argument is raised for the first time on appeal because at

trial the defense wanted to cross-examine Vaughan only to show he had caused Bataineh's death. We disagree. Stack's contention in this court and the trial court focused on the limitation on his attempt to challenge the government's theory of causation by showing it had failed to eliminate the possibility that an independent incident had caused the fatal hematoma. By attempting to raise a question about whether Vaughan had caused Bataineh's death, Stack also necessarily raised a question about Vaughan's motive to fabricate.

*nied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984), because defense counsel failed to link Vaughan's prior assaults of Bataineh to the pending charges.[9] The government also relies on *Brown v. United States,* 409 A.2d 1093 (D.C.1979), in support of the trial judge's restriction on the defense to avoid inquiry about assaults which were too remote in time to have caused the hematoma.[10] Stack, relying on *Davis v. Alaska, supra,* 415 U.S. at 316, 94 S.Ct. at 1110, contends that questions relating to the partiality of a witness are always relevant, and that the defense proffer provided a sufficient indication of good faith. Further, he maintains the trial court misapprehended the issue by basing its ruling on *Beale* and *Brown,* which did not involve cross-examination of a "crucial" government witness on bias or motive to fabricate.

Vaughan was one of four witnesses who testified that they spent time with Bataineh between the time of her release from the hospital and her death. The defense claimed Stack did not cause the injury which led to Bataineh's death and that some other person or an accidental fall did. Vaughan's testimony, therefore, was important.[11] Whether it was crucial, however, going to the heart of the defense, depends on whether defense counsel's proffer included sufficient indicia of the reliability of the evidence that Vaughan hit Bataineh and caused the fatal injury.

At the conclusion of Vaughan's direct examination, the prosecutor announced that the government would object to any questions about fights between Vaughan and Bataineh that occurred prior to June 5, 1983, and to evidence that the police had come to Vaughan's house on any prior occasions. The prosecutor argued the questions were impermissible under *Beale, supra,* 465 A.2d 796, and *Hall v. United States,* 454 A.2d 314 (D.C.1982),[12] because there was no factual predicate indicating that the altercations had occurred during the relevant period and thus they were too remote in time; more than Vaughan's mere presence had to be shown. Alternatively, the government argued that, even if questions about the prior beatings were relevant, the questions should not be allowed because they would result in jury speculation about what might have happened on Monday night, June 6. The prosecutor also questioned the relevancy to prior altercations of defense questions about the bruise near Bataineh's chin.

Defense counsel responded[13] that Vaughan had told her about the prior beat-

---

9. In *Beale,* the trial court refused to let the defendant call four witnesses who allegedly would testify that others had as much, if not more, of a motive to kill the decedent. This court found no abuse of discretion by the trial court since the defendant had failed to proffer any evidence "specifically linking" events relating to the motives of the others to the subsequent murder, and also had failed to place the others with a motive to kill in the area at the time of the murder. *Id.*

10. In *Brown,* the trial court refused to let the defendant call as a witness the person whom he wished to suggest to the jury had committed the rape. In affirming, this court observed that the proposed testimony, that the complainant had become hysterical when she saw the witness at her husband's funeral, was at best a description of an ambiguous act and might have led to the introduction of prejudicial testimony about the defendant's involvement in the murder of the complainant's husband. *Id.* at 1097.

11. *See In re J.N.,* 406 A.2d 1275, 1286 (D.C.1979) (vacated; judgment affirmed by an equally divided court), *In re J.N.,* Nos. 10737 and 12150 (D.C. May 29, 1981) (appellant's intervening cause defense hinges on demonstrating that the act for which appellant has been charged with homicide was not a "substantial factor" contributing to the victim's death).

12. In *Hall,* the court noted that in the absence of evidence tending to show that the decedent had a "special friendly relationship" with another man whom she had rejected, thus suggesting that a rejected suitor had a motive to kill similar to the defendant's motive, such inference would be pure speculation. *Id.* at 319–20.

13. DEFENSE COUNSEL: [T]his particular witness, Jimmy Vaughan, has told me about beating [the decedent] himself and he told me this the very first day I met him when he came down to the court. He picked me up at my office and gave me a ride home and Rita a ride home and on that occasion they dis-

ing himself, that the instant case was distinguishable from *Beale* and *Hall* because Vaughan was the only person, other than Bataineh's employer (Middleton) and Stack, who was with Bataineh during the relevant period, and that medical evidence was expected to establish that the bruise near Bataineh's chin was "very significant" with regard to the cause of death. Defense counsel also proffered that Rita Morris would testify Vaughan had admitted beating Bataineh in the past and had beaten her after she left the hospital. Morris also would testify that Vaughan became exasperated with Bataineh when she had been drinking.

The trial judge correctly ruled that defense counsel could inquire about the bruise near Bataineh's chin since the evidence was relevant to the ultimate issue in the case and the proffer was sufficiently reliable. Vaughan was the first person to notice the bruise on the night of June 6. When defense counsel sought to cross-examine Vaughan, no evidence had been introduced to explain the presence of the bruise along the lower left side of Bataineh's jaw, near her chin.[14] Nor did the evidence suggest that the bruise had appeared during the six hours on June 6 when she was at Capitol Hill Hospital.

■ The trial judge erred, however, in ruling that defense counsel could question Vaughan only about his assaults of Bataineh after June 5. The judge viewed evidence of any other assaults as irrelevant unless linked to "the relevant time period," a period which he did not define but appeared to base on the prosecutor's claim that evidence of assaults before the weekend of June 5 would be too remote in time. The evidence of Vaughan's relationship with Bataineh and the fact that he had

assaulted her in the past was relevant to the ultimate issue in the case, and might have caused a reasonable jury to conclude there was a reasonable possibility that Vaughan had hit Bataineh on the evening of June 6 either out of exasperation with her drinking or because of other behavior which had provoked him in the past. The government's theory of causation was based on circumstantial proof of guilt. Vaughan admitted being alone with Bataineh after her release from the hospital. He alone saw a bruise near her chin which had not been observed before she left the hospital. The defense proffered medical evidence from which the jury could conclude that Stack's slap of Bataineh's face had not caused her death. The probative value of the prior assaults testimony went beyond a general suggestion that someone other than Stack could have caused the fatal blow.

Therefore, even assuming the *Beale-Brown* rule applies, the proffered evidence was admissible; it was not extrinsic to the ultimate issue in the case, it had clear indicia of reliability, and nothing in the record suggests it was likely to confuse or mislead or result in speculation by the jury. To require a greater proffer for the admissibility of such exculpatory evidence would distort *Beale* and *Brown*. *Brown*, on which *Beale* relied, analyzed the admissibility of exculpatory evidence in terms of the proposition that "the accused in a criminal prosecution has a fundamental right to call witnesses in his own defense," limited only by the requirement that there be "sufficient indicia that the evidence is reliable." 409 A.2d at 1097 (citations omitted). The court required no more than that evidence that someone else committed the crime of which the defendant is charged "clearly

cussed how infuriating [the decedent] could be when she was drunk and how aggressive she could be and how verbally aggressive she was and how, and Rita says and, you know, you have beat her up and he says, I have, and she says you put her out; yes, I have and you called the police; yes, I have, but, I didn't beat—and Rita accused him of beating [the decedent] up that night and he denied beating

her up that night, but he did admit to beating her on other occasions.

14. Defense counsel told the court that the bruise had caused the examining doctor to think that Bataineh's death was not a routine death, and to call a medical examiner.

link that other person to the commission of the crime," and that its probative value be weighed against its prejudicial impact, including its propensity to mislead or confuse the jury. *Id.* Stack's proffer established the necessary linkage through Vaughan's presence with Bataineh on June 6 and a "new," unexplained injury at that time.

■ Alternatively, as Stack contends, the evidence of Vaughan's prior assaults of Bataineh was clearly admissible to show bias and motive to fabricate. *See Collins v. United States,* 491 A.2d 480, 487 (D.C. 1985) ("well-reasoned" suspicion standard) (citing *United States v. Pugh,* 141 U.S. D.C. 68, 71, 436 F.2d 222, 225 (1970) (so long as cross-examination is not "an improbable flight of fancy" nor "utterly implausible" it is permissible)). The evidence of the parties' phlegmatic relationship was relevant to explain how the "new" injury might have occurred; the nature of that relationship was, according to the defense proffer, admitted by Vaughan. Questions about Vaughan's prior assaults would not have been a "flight of fancy," and the record does not suggest that the prior incidents were so remote in time as to be irrelevant to the parties' relationship on June 6, 1983. *See Lawrence, supra,* 482 A.2d 374; *cf. Jones v. United States,* 477 A.2d 231, 243 (D.C.1984) (evidence of prior threats many years ago relevant to show motive); *United States v. Bobbitt,* 146 U.S. App.D.C. 224, 228, 450 F.2d 685, 689 (1971) (evidence of prior threat many years ago was admissible to show that bad blood between the defendant and the victim had continued).

■ Accordingly, since evidence about the relationship between Vaughan and Bataineh was relevant, in view of the circumstantial nature of the government's evidence of causation, to the jury's assessment of Vaughan's credibility, the trial court erred in refusing to let defense counsel inquire about Vaughan's assaults of Bataineh prior to June 5. Because such cross-examination went to the heart of the defense theory, the error was of constitu-

tional magnitude. *Goldman, supra,* 473 A.2d at 857 (applying *Chapman* standard). Given the equivocal nature of the medical testimony, we hold that keeping "from the jury relevant and important facts bearing on the trustworthiness of crucial testimony" was not harmless error beyond a reasonable doubt.

### III

Stack next contends that the trial judge's instructions did not give a fair presentation of the defense theory to the jury. Because he admitted the truth of a good part of the government's case, he argues that his defense required the jury to be advised of the significance of his independent cause theory. *See Laughlin v. United States,* 128 U.S.App.D.C. 27, 34, 385 F.2d 287, 294 (1967), *cert. denied,* 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968) (citing *Levine v. United States,* 104 U.S. App. D.C. 281, 261 F.2d 747 (1958)).

■ A "defendant is entitled to an instruction on his theory of the case when properly requested by counsel and when the theory is supported by any evidence." *Montgomery v. United States,* 384 A.2d 655, 660 (D.C.1978); *see Hale v. United States,* 361 A.2d 212, 216 n. 9 (D.C.1976). Although the instruction need not be given in the exact language requested, *Fludd v. United States,* 336 A.2d 539, 541 n. 3 (D.C. 1975); *Leftwich v. United States,* 251 A.2d 646, 649 (D.C.1969), the trial court commits reversible error when it refuses to present adequately a defendant's theory of the defense. *See Levine, supra,* 104 U.S.App. D.C. at 282–83, 261 F.2d at 748–49 (reversible error to deny defense request for an instruction "where special facts present evidentiary theory which if believed defeats the factual theory of the prosecution...."). The trial court is not required to "rehearse the evidence, especially where the effect would be ... to give special emphasis to the defendant's testimony." *Montgomery, supra,* 384 A.2d at 660 (quoting *Laughlin, supra,* 128 U.S.App.D.C. at 34, 385 F.2d at 294). Nor may the court give instructions

that favor the government's version of the evidence. *See Levine, supra,* 104 U.S.App. D.C. at 283, 261 F.2d at 749. For this court the key question is whether the instructions to the jury were an adequate statement of the law, *see Leftwich, supra,* 251 A.2d at 649; *Spade v. United States,* 277 A.2d 654, 656 (D.C.1971), and our task is to review the instructions as a whole to determine whether they fairly and fully presented the defense theory. *See Montgomery, supra,* 384 A.2d at 661.[15]

Defense counsel requested the trial judge to instruct the jury that:

> The theory of the defense in this case is that Robert Stack did not cause the death of Helen Bataineh. The fight between Helen Bataineh and Robert Stack, which was started by Helen Bataineh, resulted in injuries to her ribs but did not cause the subdural hematoma from which she died. The subdural hematoma resulted from independent causes which happened after her release from the hospital.
>
> The defendant has no burden to show or prove by what means the decedent died. The burden of proving how the decedent died always remains with the government.
>
> If you have a reasonable doubt whether the fight between Helen Bataineh and Robert Stack resulted in injuries from which she died, then you must find him Not Guilty.

The trial judge's complete instruction on the defense theory was: "Ladies and gentlemen, the theory of the defendant is that he did not inflict wounds from which the deceased died. He also asserts the defense of self-defense." The judge elaborated on the self-defense theory, but made no mention of the theory of independent cause. Elsewhere the judge instructed the jury on proximate cause, stating that the defendant was responsible for the foreseeable and likely consequences of his acts.[16] In instructing on the elements of second degree murder and voluntary manslaughter, the judge told the jury that to convict it must find the defendant "inflicted an injury or injuries upon the deceased and that the deceased have died as a result of such injuries." The judge gave the standard instructions on reasonable doubt and the government's burden of proof.

■ We hold that the instructions inadequately expressed the defense theory of independent cause. In effect, as Stacks points out, the instruction told the jury "no more than that the defendant denied killing the decedent—a general denial." The phrase "independent cause," or its equivalent, and the legal principle involved were not mentioned in the instructions. In addition, the judge's expansion of the standard instruction on causation in murder and manslaughter had the effect of emphasizing the government's theory of causation. The single "denial" sentence instructing on Stack's theory was also minimized in significance by the contrast between it and the lengthy (two pages in the transcript) instructions on self-defense. Indeed, the instructions as a whole undercut the focus and force of any suggestion in the instructions about independent cause as well as defense counsel's closing argument that

---

**15.** Erroneous instructions are not harmless if we find the jury was substantially swayed by them. *See United States v. Lemire,* 232 U.S.App. D.C. 100, 720 F.2d 1327 (1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); *Mullen v. United States,* 105 U.S.App.D.C. 25, 263 F.2d 275 (1958).

**16.** The judge instructed the jury:

> A person is held responsible for all consequences or harm which are proximately caused by his [or her] criminal conduct. This concept of proximate cause means that an

accused may be found guilty of a criminal offense even though his [or her] acts were not the sole or immediate cause of the victim's death or injury. If the ultimate harm to the victim should have been foreseen or has, or has been reasonably related to the defendant's conduct the defendant's conduct should be regarded as the cause of death.

The judge then gave the standard instruction on causation in murder and manslaughter; thus the jury received an expanded version of the standard murder and manslaughter instruction.

the government had failed to negate the independent cause theory. *See Laughlin, supra,* 128 U.S.App.D.C. at 34, 385 F.2d at 294 ("there was a risk that the jury might find the defendant guilty although believing his testimony, because of failure to appreciate the significance of defendant's evidentiary theory.").

 Stack clearly met his burden to show that he was entitled to an instruction which expressly set forth his theory of an independent cause. *Fersner v. United States,* 482 A.2d 387, 393 (D.C.1984) (evidence viewed most favorably to defendant). Defense counsel did not insist on the precise language requested. Assuming, as the government suggests, that the first paragraph of the requested instruction would have unduly emphasized the defense version of the evidence, the judge easily could have made appropriate modifications. That defense counsel argued the independent cause theory to the jury in closing does not cure the error since the jury must be instructed on the legal principles which are to guide its deliberations, and the court has the obligation to state those principles in the instructions.

## IV

Stack further claims that allowing a key government witness to testify by color video-tape deposition although the witness was willing and available to testify at trial

violated his constitutional right to confrontation and Super.Ct.Crim.R. 15(e).[17]

 Due process requires that the prosecution make a reasonable, good faith effort to secure a witness' presence. *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980); *Warren v. United States,* 436 A.2d 821, 826–27 (D.C. 1981). The government bears a substantial burden to show that a witness is unavailable to testify at trial. As described in *Ohio v. Roberts, supra,* although "the law does not require the doing of a futile act ...[,] if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." 448 U.S. at 74, 100 S.Ct. at 2543 (emphasis in original).[18] The trial court must determine whether a witness is unavailable, and if so, whether and under what circumstances the witness' deposition should be admitted at trial. *See Warren, supra,* 436 A.2d at 825. The issue is whether there was sufficient evidence to support the trial judge's ruling that the government met its burden to show Middleton was unavailable to testify at trial, and that his deposition was admissible into evidence. *Id.* at 829. We review the trial court's determinations for abuse of discretion. *Id.* at 831.

This court has made clear that it has not sanctioned "a new category of medical unavailability in all cases where witnesses are likely to suffer adverse emotional or psy-

17. Super.Ct.Crim.R. 15(e) provides, in pertinent part:
 At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used as substantive evidence if the witness is unavailable. 'Unavailability as a witness' includes situations in which the declarant ... (D) Is unable to be present or testify at the hearing because of death or then existing physical or mental illness or infirmity.

18. In *Ohio v. Roberts, supra,* 448 U.S. 56, 100 S.Ct. 2531, a transcript of a witness' testimony at the preliminary hearing was admitted in rebuttal after the witness failed to appear at trial following the issuance of five subpoenas. An Ohio statute permitted the use of such testimony when the witness "cannot for any reason be

produced at the trial." The witness' mother testified at a voir dire hearing on the admissibility of the witness' transcript, that her daughter had left home after the preliminary hearing, had been in San Francisco a year before the trial, and had last called, without revealing where she was, seven or eight months ago when she was traveling outside Ohio; the mother knew of no way to reach her daughter, even in an emergency, and knew of no one who knew where her daughter was. The Supreme Court affirmed, holding that although the witness had not been cross-examined at the preliminary hearing, defense counsel had tested the witness' veracity through leading questions, and thus the court had substantially complied with the confrontation requirement.

chological effects as a result of testifying against their assailants." *Id.* In *Warren, supra,* the defendant was charged with kidnapping and various sexual assaults and armed robbery, and the complainant's availability to testify was disputed. Two psychiatrists, one of whom was appointed by the trial judge, testified about the complainant's psychological unavailability. *Id.* at 828–29. This court affirmed the trial judge's finding that the complainant was unavailable because of "extreme circumstances" consisting of a high likelihood of temporary psychological injury, perhaps even psychosis, and a possibility of permanent psychological injury.

Middleton, according to the prosecutor, was an "essential" witness in the government's effort to establish the absence of an independent cause of Bataineh's death. In support of the motion to take Middleton's deposition under Super.Ct.Crim.R. 15(a),[19] the government contended that he was unavailable to testify at trial because of his poor medical condition and the likely consequences to his health which the emotional stress of testifying would cause. The motion referred to statements by Middleton's cardiologist, and offered a letter from Middleton's personal physician. The unsworn letter described Middleton, who was 71 years old at the time of his deposition, as suffering from hypertension, a narrowing of the main heart valve, congestive heart failure and diabetes. The letter, which was written six months before the trial, expressed concern that testifying at trial could have "potentially very serious" ill effects on Middleton "if he is placed under any great emotional stress or tension." A second unsworn letter from the same doctor, written three months before the trial stated that a courtroom appearance would place Middleton and his life in jeopardy. At his deposition four and one-half months before trial, Middleton testified that he suffered from high blood pressure, diabetes, shortness of breath and was too fat; he had a pacemaker, and had to avoid excitement. During a telephone conversation with the trial judge shortly before trial, however, Middleton told the judge that he was willing to appear; the judge commented lightly after the telephone conversation that he thought his "charm and personality" had caused Middleton to say he was willing to testify at trial. Stack disputed the severity of Middleton's illness, the partiality of his doctor and the absence of sworn testimony, as well as whether, assuming these medical facts, they were sufficient to establish that Middleton was unavailable to testify as a witness at trial.

■■■ The quantum and quality of evidence of Middleton's unavailability to testify at trial does not measure up to that in *Warren.* The evidence consisted only of unsworn hearsay, Middleton's view of his health, and the trial judge's evaluation of Middleton's health based on observations of Middleton at his deposition, and the judge's telephone conversation with Middleton. Nor does the evidence of unavailability rise to the level of evidence that was present in either *Ohio v. Roberts, supra,* or *Harrison v. United States,* 435 A.2d 734 (1981) (en banc),[20] where the witness' una-

**19.** The government stated in its motion pleadings that:

Middleton's testimony is essential to describing the activities of the decedent during the time between the assault by the defendant and her death to refute any suggestion that she was injured subsequent to the beating inflicted by Mr. Stack while at the home of Mr. Middleton and to corroborate the findings of the medical examiner concerning the attack and the progression of the effects of her fatal injuries. His testimony is thus essential to the Government's case-in-chief.

**20.** In *Harrison,* the issue was the admissibility of the victim's spontaneous utterance; availability was uncontested. Four judges held that "under these particular circumstances" the government's sparse showing of unavailability met the good faith test of *Ohio v. Roberts* where the government had tried to locate and present the witness and the witness' daughter had advised a police officer of the victim's advanced age, uncertain medical condition, distance from this jurisdiction and inability to travel. *Id.* at 736. However, the plurality noted that "[t]he government would do well to relate carefully and comprehensively for the record at trial its ef-

vailability involved facts about which a layperson would be knowledgeable. Here physical unavailability was not an issue; Middleton lived nearby, he was not physically impaired but still active, going to work every week, he had appeared without adverse consequence for the deposition, and he was willing to testify at trial.[21]

The trial judge initially had stated correctly that he would need to conduct a voir dire hearing to determine, on the basis of competent evidence, Middleton's unavailability for medical reasons. *See Warren,* 436 A.2d at 828–30.[22] Although *Harrison, supra,* implicitly suggests that expert testimony is not required, 435 A.2d at 738, 740, *Warren, supra,* which was decided after *Harrison,* recognized that expert testimony was required to determine psychological unavailability because the trial judge's personal observations were "pointless in view of his lack of psychiatric expertise." 436 A.2d at 830; *Warren v. United States,* 515 A.2d 208, 209–10 (D.C.1986) (per curiam) ("testimony of independent court-appointed psychiatrist will usually be the proper foundation for a finding of psychological unavailability of a witness").[23] This requirement is consistent with the rule in a number of other jurisdictions.[24]

Accordingly, we hold that where a crucial government witness' unavailability is contested, and the witness' unavailability is based on the effect which a trial appearance would have on particular medical conditions as well as the witness' general health, expert evidence is required to support a finding that the witness is unavailable to testify at trial. Many older people undoubtedly suffer from the type of medical problems described by Middleton, and probably would prefer not to testify at trial. Although deference to the trial judge is appropriate where a witness' appearance and reaction to questioning in the atmosphere of a trial must be evaluated, the trial judge's reliance on hearsay and his (and Middleton's) impressionistic, personal opinions about the effect of a trial appearance on Middleton's health are an insufficient basis on which to deny Stack the opportunity to exercise a fundamental constitutional right. *Cf. Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895); *Springer, supra,* 388 A.2d at 854. Because we reverse and remand this case on other grounds, we need not consider whether Stack's inability

forts to make the witness available and the reasons such efforts have proved unavailing." *Id.* at n. 5 For the factual background, see *Harrison v. United States,* 407 A.2d 683 (D.C. 1980) (judgment vacated in 1981).

21. *United States v. Bell,* 500 F.2d 1287, 1290 (2d Cir.1974), cited by the government, is not to the contrary. There the finding of unavailability was upheld where a doctor's letter stated that the witness' recent surgery made her unavailable for at least two and a half months. The appellant in *Bell* did not contest the genuineness of the witness' illness or its duration at trial, and on appeal argued only that a trial continuance might have enabled the witness to testify in person.

22. At Middleton's deposition the trial judge mentioned that he would determine Middleton's availability to testify at trial on the basis of Middleton's deposition testimony and the medical records. Insofar as the record indicates, the medical records were confined to the two letters from Middleton's personal physician and, per-

haps, the representations in the government's motion about his cardiologist's opinion.

23. *See, e.g., State v. Hannagan,* 473 A.2d 291, 293 (R.I.1984) ("[t]he trial justice's visual diagnosis does not rise to [the level of competent evidence], for, as Aesop pointed out in 'The Wolf in Sheep's Clothing,' 'Appearances are deceptive.'" JACOBS, FABLES OF AESOP 94 (1902)).

24. *See, e.g., People ex rel. Faulk v. District Court,* 667 P.2d 1384, 1390 (Colo.1983) (en banc); *State v. Hannagan, supra* note 23, 473 A.2d at 293 (expert testimony needed to show that witness' attendance or testimony is "relatively impossible and not merely inconvenient"); *People v. Stritzinger,* 34 Cal.3d 505, 194 Cal.Rptr. 431, 439–41, 668 P.2d 738, 746–47 (1983) (*en banc*) (need expert testimony to determine that an existing illness is the cause making it impossible for witness to testify); *Sheehan v. Wisconsin,* 65 Wis.2d 757, 223 N.W.2d 600 (1974); *People v. Del Mastro,* 72 Misc.2d 809, 813, 339 N.Y.S.2d 389, 393 (1973).

to confront Middleton at trial was harmless beyond a reasonable doubt.[25]

## V

Finally, Stack contends that the evidence of causation was insufficient to support his conviction because the government failed to show a sufficient nexus between Stack's slap of Bataineh on June 6, and her death on June 8. The government concedes on appeal that its medical evidence, standing alone, was insufficient to convict,[26] but maintains that it met its burden through the medical testimony coupled with the lay testimony about Bataineh's deteriorating physical condition and the absence of any evidence another event led to her death.

Upon review of the denial of a motion for judgment of acquittal, we view the evidence most favorably to the government, drawing all reasonable inferences in its favor. *Patterson v. United States*, 479 A.2d 335, 337–38 (D.C.1984); *Boyd v. United States*, 473 A.2d 828, 832 (D.C.1984). Neither this court nor the trial court may

25. Were we to reach the issue, it would be difficult, if not impossible, for this court to determine whether the trial judge's error was harmless, given (1) the importance of Middleton's testimony to the government's theory that Bataineh suffered no accidents after Stack struck her; (2) Middleton's evident concern throughout the videotape deposition that his actions in reacting to Bataineh's condition be viewed as appropriate, thus indicating an area of possible bias which defense counsel could have pursued during cross-examination at trial; and (3) the fact that the deposition was edited before presentation to the jury in some undisclosed fashion so that we were able to view only an edited version. Hence, a remand would be required.

We find unpersuasive Stack's contention that post-deposition discovery had produced new documents which would compel a finding of prejudice. At trial, the substance of the new documents was addressed in Stack's cross-examination of the paramedics and the fire department official, who explained how Bataineh's body was moved onto the bedroom floor. Stack also had an opportunity to cross-examine Joan Park about any inconsistencies with Middleton's testimony. Finally, the editing of the deposition is not an issue; Stack did not object to the admission of the edited deposition at trial or on appeal.

26. The government's experts testified their findings were "consistent" or "very consistent" with the view, to a reasonable medical certainty, that Stack caused Bataineh's subdural hematoma. Although the question of the sufficiency of expert testimony on causation has not been decided by this court in the context of a criminal trial, *but cf. Psychiatric Institute of Washington v. Allen*, 509 A.2d 619, 624 (D.C.1986) (expert must testify, based on reasonable degree of medical certainty, that "defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries") and *Martin v. United States*, 109 U.S.App.D.C. 83, 84, 284 F.2d 217, 218 (1960) (expert testimony that it was "possible" or "probable" the defendant suffered from a mental illness and the

illness had a causal relation to the charged crime (sale of narcotics), could not be the basis for a finding of fact: "In the language of the law of evidence, that which is merely possible, standing alone and not offered as auxiliary or rebuttal testimony, is immaterial to the ascertainment of the facts and so is inadmissible as evidence of that fact." *Id.* at 85, 284 F.2d at 218), other jurisdictions have held such testimony is insufficient to send a case to the jury. *See Commonwealth v. Embry*, 441 Pa. 183, 272 A.2d 178, 179 (1971) (proof of causation beyond a reasonable doubt required medical testimony that physical and emotional stress resulting from struggle over purse was sole cause of fatal heart attack "with a reasonable degree of medical certainty"); *Commonwealth v. Radford*, 428 Pa. 279, 236 A.2d 802, 803–04 (1968) (evidence of probable causation insufficient for government to meet its burden of proof on causation); *People v. Brown*, 57 Ill.App.3d 528, 15 Ill.Dec. 113, 116, 373 N.E.2d 459, 462 (1978) (state's burden is to show beyond a reasonable doubt that defendant's act was "a contributing cause to a death such that the death did not result from a source unconnected with the defendant's act"); *see also Jackson v. State*, 652 S.W.2d 415, 419 (Tex.Ct.App.1983) (en banc) (connection between blows and cause of death too unclear to support conviction where medical evidence was that defendant's blows to deceased child were an "unlikely and improbable" cause of the injury causing death); *Reed v. State*, 180 Ind.App. 5, 387 N.E.2d 82, 85 (1979) (medical testimony that crash would be consistent with injuries sustained insufficient where no evidence presented that blow to decedent's head, which caused death, occurred when car crashed; state must prove defendant's conduct "is the direct and proximate cause of the death of the victim"); *Commonwealth v. Gilman*, 485 Pa. 145, 401 A.2d 335, 339 (1979) (even though medical expert did not use words "reasonable medical certainty," reasonable medical certainty could be found from the record which supported conviction where testimony that defendant beat the decedent with a blunt instrument and body subsequently discovered).

"usurp the jury's prerogative of determining credibility, weighing the evidence, and drawing reasonable inferences of fact." *Boyd, supra,* 473 A.2d at 832; *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941); *In re A.H.B.,* 491 A.2d 490, 496 (D.C.1985). Reversal is required "only where there is no evidence upon which a reasonable mind could infer guilt." *Patterson, supra,* 479 A.2d at 338; *see Franey v. United States,* 382 A.2d 1019, 1022 n. 6 (D.C.1978); *Crawford v. United States,* 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967); *Curley v. United States,* 81 U.S.App.D.C. 389, 392–93, 160 F.2d 229, 232–33, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed.2d 1850 (1947). Because Stack introduced evidence after his motion for acquittal was denied at the close of the government's case, only the motion at the close of all the evidence is before us, *see Hawthorne v. United States,* 476 A.2d 164, 168 n. 10 (D.C.1984); consequently, we determine the propriety of the trial court's denial in light of all the evidence. *Id.*

▇▇ Although the government is not required to negate every possible inference of innocence, *Chaconas v. United States,* 326 A.2d 792, 798 (D.C.1974), the preclusion of defense counsel's attempt to cross-examine Vaughan on his prior assaults of Bataineh deprived the jury of the opportunity to weigh Vaughan's credibility in the light of relevant, admissible evidence, and preserved inviolate the favorable inference regarding the cause of death on which the government must rely to meet its burden of proof. As discussed in Part II, *supra,* Vaughan's testimony was a crucial part of the government's effort to prove that Bataineh's death was not independently caused by an event occurring after Stack had slapped her.[27] Vaughan's testimony therefore helped establish proximate cause, a crucial element necessary for conviction. Since the trial judge's limitation on Stack's cross-examination of Vaughan violated Stack's right of confrontation, we must decide if Vaughan's testimony should be disregarded in determining whether the government met its burden of proof.

Our research has not found a case explicitly addressing the right to confront adverse witnesses in the context of evidentiary sufficiency. However, it has been held repeatedly that the appropriate remedy where the defense has not been permitted to cross-examine a key government witness is to remand for a new trial. *See Delaware v. Van Arsdall, supra,* 106 S.Ct. 1431; *Davis v. Alaska, supra,* 415 U.S. 308, 94 S.Ct. 1105; *Lawrence, supra,* 482 A.2d 374; *Goldman, supra,* 473 A.2d 852; *Springer, supra,* 388 A.2d 846. This court has declined to hold the evidence insufficient and a new trial therefore barred even when it has acknowledged that without the witness' testimony the government's evidence would have been insufficient to convict. *Lawrence, supra,* 482 A.2d at 377; *Goldman, supra,* 473 A.2d at 858; *Springer, supra,* 388 A.2d at 857.

This approach makes sense in the framework of our judicial system. The right to test an adverse witness' reliability and veracity through cross-examination is vital to maintaining the "integrity of the fact-finding process." *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973) (quoting *Berger v. California,* 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969)); *Howard v. United States,* 473 A.2d 835, 838 (D.C.1984); *see Delaware v. Van Arsdall, supra,* 106 S.Ct.

27. Indeed, the government specifically recognized the need to refute suggestions of an independent cause subsequent to Stack's slap on June 6, of Bataineh's death. *See supra* note 20. There was no evidence that Stack had slapped or kicked Bataineh in the area of the jaw where Vaughan saw the bruise, which the medical testimony identified as significant in determining the cause of death. The nurse at Capitol Hill Hospital testified that Bataineh did not complain of injuries around her face, only the collar bone and the rib areas. A photograph of Bataineh's injuries showed that the bruise was under Bataineh's jaw, and not in the area Stack had slapped her or kicked her. Thus, since Vaughan was alone with Bataineh at a relevant time, without Vaughan's testimony, the government's evidence would have been insufficient.

1431). If the first trial is fundamentally flawed as a result of a violation of a defendant's right of confrontation, and the error is not harmless beyond a reasonable doubt, *Delaware v. Van Arsdall, supra,* a remand is required to insure that the defendant receives a fair trial. Given the totality of the evidence presented by the government, we can determine that Vaughan was a crucial witness, but we do not know whether further cross-examination would have been effective, nor whether the government would have been able to rehabilitate cross-examination undermining Vaughan's credibility. The government obtained a favorable ruling limiting cross-examination at the trial and was entitled to rely on it by assuming Vaughan's testimony would not need to be buttressed.

■ The evidence of Stack's guilt, with Vaughan's testimony, was sufficient to send the case to the jury. The jury could reasonably believe the government's witnesses, and conclude that an accident or injury had not occurred after Stack struck Bataineh and before her death. In view of the evidence of the force of the blow that Stack delivered and the medical evidence that Bataineh's injuries could have caused the fatal subdural hematoma, a reasonable jury could find beyond a reasonable doubt that Stack's actions were the proximate cause of Bataineh's death.

Accordingly, the judgment is reversed, and the case remanded for a new trial.

*Reversed and remanded.*

MACK, Associate Judge, concurring in part and dissenting in part:

I agree with the majority that appellant Robert Stack's manslaughter conviction must be reversed because he has been deprived both of his constitutional right to confront a key witness and of his right to have the jury instructed on his theory of the case. However, I find the majority's

conclusion that the evidence was sufficient to go to the jury, as well as the rationale employed to reach that result, to be extremely troubling.

The majority, noting the government's concession that the medical evidence, standing alone, was insufficient to convict appellant for manslaughter, concludes that without James Vaughan's testimony the evidence would have been insufficient. In reversing appellant's conviction because of the court's limitation on cross-examination, the majority has concluded that Vaughan was a crucial witness whose testimony went to the heart of the defense theory that some intervening cause, not the action of appellant, had caused the death of the victim. The basic reason why reversal is mandated in such a case is that curtailment of cross-examination has prevented the jury from receiving information *essential* to an assessment of the credibility of the government witness—here, "a key witness ... [whose] testimony establishes a required element of the charged offense...." *Lawrence v. United States,* 482 A.2d 374, 377 (D.C.1984) (quoting *Springer v. United States,* 388 A.2d 846, 855 (D.C.1978)).

I think it therefore an anomaly for the majority to reverse because the jury was prevented from assessing the credibility of testimony essential to the conviction, while simultaneously concluding, as the basis of its holding that the evidence was sufficient to go to the jury, that the same testimony can be used to supply the essential element needed to convict. The majority concedes that there are no cases explicitly addressing the right to confront adverse witnesses in the context of evidentiary sufficiency; the cases it does cite do not support the proposition that, where there has been reversible error by the trial court in curtailing cross-examination, the appropriate remedy is that of a remand for retrial.[1] *See Delaware v. Van Arsdall,* —— U.S. ——,

---

1. Retrial is constitutionally forbidden where the evidence presented at trial was insufficient to convict. *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). This is

so because the Double Jeopardy Clause mandates that "No person shall ... be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (no sufficiency issue raised; remand by the United States Supreme Court to the Delaware Supreme Court for the sole purpose of determining whether the error in limiting cross-examination was harmless); *Davis v. Alaska*, 415 U.S. 308, 320–21, 94 S.Ct. 1105, 1112–13, 39 L.Ed.2d 347 (1974) (no sufficiency issue raised); *Lawrence v. United States, supra*, 482 A.2d at 378 (same); *Goldman v. United States*, 473 A.2d 852, 858 (D.C.1984) (same); *Springer v. United States, supra*, 388 A.2d at 857 (same); *see also Delaware v. Van Arsdall, supra*, 106 S.Ct. at 1440 (Marshall, J., dissenting) ("denial of cross-examination ... may deprive the defense of its best opportunity to expose genuine flaws in the prosecution's case—flaws that the cold record will not reveal to an appellate court").

Moreover, I do not agree with the majority's conclusion that its approach makes sense in the framework of our judicial system. It does not make sense to me to say that testimony which has not been tested for the purpose of maintaining the "integrity of the fact-finding process," majority opinion, *supra* p. 161, can provide the sufficiency necessary to send a case to the jury. It does not make sense to me to say that the government, after having pressed for and obtained an erroneous ruling preventing the jury from assessing the credibility of "crucial" testimony, is nevertheless permitted to rely on that testimony and is not held accountable for its failure to produce other evidence essential to support its case.

I would reverse. I would not remand.