*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-968

JOSEPH PHIL SMITH, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-1399-13)

(Hon. Rhonda Reid-Winston, Trial Judge)

(Argued March 20, 2017       Decided December 28, 2017)

*Ian A. Herbert*, with whom *Nathaniel Edmonds*, *Jamie Gardner*, *Matthew Crossman*, and *Danielle R.A. Susanj*, were on the brief, for appellant.

*Jennifer B. Loeb*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Peter Lallas*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Opinion by *Senior Judge* FARRELL, concurring in part and dissenting in part, at page 22.

THOMPSON, *Associate Judge*:   A jury found appellant Joseph P. Smith guilty of first-degree burglary, kidnapping, robbery, and threatening to kidnap or injure a person.   Appellant argues in this appeal that the evidence was insufficient for conviction and that the trial court erred in admitting certain testimony and physical evidence, in refusing to give a portion of appellant's defense theory in instructing the jury, and in failing to intervene when the prosecutor made allegedly improper statements during closing argument.   We are satisfied that the evidence was sufficient for conviction, but are persuaded that appellant is entitled to relief based on what we conclude was the erroneous admission of an item of physical evidence. We therefore reverse and remand for a new trial.

## I.

The government presented evidence at trial that on the evening of January 27, 2013, Michael Hilliard was at home in his apartment at 2410 Good Hope Road, S.E., when a man "with dreadlocks, or cornrows" knocked on his door and asked whether he had a cigarette.   Mr. Hilliard testified that he had "seen [the man] around" and had given him cigarettes before.   Mr. Hilliard told the man that he did not and then closed the door.   About half an hour later, the same man knocked on Mr. Hilliard's door again and asked the same question.   After Mr. Hilliard again

said "no," "somebody came rushing in, [and] pushed the door open." Mr. Hilliard

testified that a total of "[m]aybe three" people, two of whom were wearing ski

masks, entered his apartment at that time, including "the person with dreads." At

that point, a struggle ensued until one of the men in a ski mask tied Mr. Hilliard's

hands behind his back with wire from a speaker. The man with dreadlocks began

to move two of Mr. Hilliard's television sets. Mr. Hilliard later discovered that his

laptop had been moved, and that his keys, MP3 player, mobile hotspot device,

portable speakers, and wallet were missing. He testified that one of the men in a

ski mask said to him, "Don't say anything [to the police]. We know where you

live."[1] At some point after Mr. Hilliard's hands had been tied, there was a knock at

the door, and the man with the dreadlocks went to the door, opened it, and then

closed it "real fast and said it was the police." The man ran "out the

back . . . bedroom," and the other two individuals also "took off running."

Metropolitan Police Department (MPD) Officer Filip Simic testified that, in

response to a call for an assault in progress, he knocked on the door of Mr.

---

[1] Mr. Hilliard was reluctant to testify, and a material witness warrant had to be issued to obtain his presence in court. He testified that he had refused to participate in a show-up identification because "of what one of the men said to [him] in [his] apartment[,] which had made [him] afraid." During trial, he left voicemails for the prosecutor describing his fear and asked for "protection" and "witness security."

Hilliard's apartment. Officer Simic told the jury that a man "with an all dark outfit," "long dreads," and "black gloves" — a man Officer Simic identified in court as appellant — answered the door. For about "four to five seconds," Officer Simic and the man "lock[ed] . . . eyes" before the man "slammed the door in [the officer's] face."

Officer Simic ran back out of the building to obtain assistance from his fellow officers and to tell them to stay outside in case anyone tried to escape through any of the windows. Officer Simic testified that he saw appellant "come out [a] window" that was about eight to ten feet above the ground (even though another officer, Officer Jennifer Ellis, had yelled, "[P]olice, don't jump"). After initially testifying that she did not see in the courtroom the man with "long dreads" who jumped out of the window and identifying that man as appellant's co-defendant Andrew Roberson, Officer Ellis testified that appellant was the man she saw jump out of the apartment window after she had yelled for him to stop.

Officer Johnny Hernandez similarly testified that he saw "the young man jump out the window at 2410 Good Hope Road, and saw Officer Ellis run after the man. Officer Hernandez initially followed the two in his vehicle, but eventually exited his car when the man ran into a wooded area. Searching the area with a

flashlight, Officer Hernandez eventually found appellant, lying on the ground. After placing appellant in handcuffs, Officer Hernandez patted him down for any weapons and asked whether he "had anything." Appellant answered, "I have the man's . . . wallet in my . . . back pocket." Officer Aaron Makanoff testified that he found on appellant a number of items that belonged to complainant Hilliard: a mobile hotspot, an MP3 player, identification cards, and keys. Officer Makanoff testified that when appellant was in the police scout car after his apprehension, appellant said that the property found on him was passed to him when "[w]e were jumping out of" the window.[2]

The government offered into evidence and the court admitted a pair of gloves (Government Exhibit 31) that Officer Simic testified were the "same gloves" he saw appellant wearing when he opened the door to Mr. Hilliard's apartment in response to the officer's knock. Officer Simic further testified that he received the gloves from Officer Ernest Higginbotham and that he gave the gloves to Officer Hernandez to put into evidence.

---

[2] Officer Makanoff testified initially that appellant made statements that "somebody passed [items] to him out a window that *they* were jumping out of" (emphasis added), but subsequently testified that he "fe[lt] quite sure that in [his] notes it says 'we' [rather than 'they']."

Appellant testified that he was never in Mr. Hilliard's apartment and never jumped out of a window. He told the jury that on the evening of January 27, 2013, he left his apartment to go to a gas station on Good Hope Road to buy orange juice for his daughter. He testified that as he was walking home from the gas station, he heard a person say "A-homes" and then turned and saw "a guy at the window." The "guy" asked appellant to "help him right quick" with "this TV." The "guy" then "disappeared" inside and, after a short time, appellant saw a man in a short black coat "leap[] from the window." When the man landed, he ran past appellant, and appellant noticed on the grass a wallet and what appellant thought were a phone and an MP3 player. Appellant testified that he picked up the items, placed them in his pockets, "started walking," and then "started running" after he saw the police. Appellant testified that he did not have gloves on that evening.

Appellant's trial counsel called Mr. Hilliard during the defense case to confirm that appellant is "not the person that entered [Mr. Hillard's] apartment." Mr. Hilliard answered that he had "never seen [appellant] before." Mr. Hilliard further testified that the assailant with the dreadlocks was much taller than he is. After defense counsel asked Mr. Hilliard to stand side-by-side with appellant, Mr. Hilliard agreed that "the person with dreadlocks was substantially taller than [appellant] who just stood beside [Mr. Hilliard]."

**II.**

We begin our analysis with appellant's argument that there was insufficient evidence to support his convictions. This, of course, impacts whether the government will have the opportunity to retry appellants if we find that any of the asserted errors constituted reversible error. *See Evans v. United Sta*tes, 122 A.3d 876, 886 (D.C. 2015) ("[W]e … address Mr. Evans's challenge to the sufficiency of the evidence, because a ruling in Mr. Evans's favor on that issue would bar retrial on Double Jeopardy grounds."); *Ford v. United States*, 533 A.2d 617, 627 (D.C. 1987) ("When the reversal is based on the insufficiency of the evidence, . . . a new trial is not permitted.").[3]

Appellant contends that "no reasonable jury could conclude that the government had provided sufficiently reliable evidence to prove beyond a reasonable doubt that Mr. Smith was one of the burglars in Mr. Hilliard's apartment on the night of the alleged crimes." We disagree. "'In a sufficiency

---

[3] Despite arguing that the evidence was insufficient for conviction, appellant's brief asks us to reverse the judgment and remand the case "for a new trial." We assume that appellant did not thereby mean to abandon his insufficiency-of-the-evidence claim.

challenge we view the evidence in the light most favorable to the government, draw all reasonable inferences in the government's favor, and defer to the factfinder's credibility determinations.'" *Medina v. United States*, 61 A.3d 637, 641 (D.C. 2013) (quoting *Dunn v. United States*, 976 A.2d 217, 221 (D.C. 2009)). "A court must deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (D.C. 1979)).

Appellant's insufficiency argument rests heavily on Mr. Hilliard's testimony that "he knew the burglar with dreadlocks" from the neighborhood and that appellant "was not that burglar." Appellant emphasizes that "[o]nly Officer Simic's testimony placed [appellant] in the apartment" and that "Officer Simic himself was inconsistent about the description of the person he saw" there. However, as we have often stated, "the testimony of a single witness is sufficient to sustain a criminal conviction." *See, e.g.*, *Gibson v. United States*, 792 A.2d 1059, 1066 (D.C. 2002). This is so even when the witness is "not a perfect witness" or when the testimony of the single witness is "contradicted by other witnesses or evidence." *Tann v. United* States, 127 A.3d 400, 430 (D.C. 2015).

Although appellant contends there were some discrepancies in Officer Simic's description of appellant, the jury was free to, and apparently did, credit his testimony, and "[w]e afford the jury's credibility determination substantial deference on appellate review." *Id.* Further, the jury was entitled to credit Officer Makanoff's recollection that appellant made a statement to the effect that "we" — appellant and others — jumped out of the window of Mr. Hilliard's apartment. In addition, the officers' identifications of appellant were bolstered by the evidence that a variety of Mr. Hilliard's belongings were found on appellant at the time of his arrest. While appellant in his testimony offered an innocent explanation for having Mr. Hilliard's items, the jury was entitled to (and apparently did) discredit appellant's testimony.

## III.

Appellant contends that admission of Exhibit 31, the black gloves, and Officer Simic's testimony identifying the gloves, constituted error. More specifically, appellant contends that the gloves (which the prosecutor proffered were recovered by a cell block technician who searched appellant) should not have been admitted "[w]ithout any testimony from Officer Higginbotham or any other

officer explaining where the gloves were found." Appellant asserts that without evidence that the gloves were seized from him, the gloves, as well as Officer Simic's testimony connecting the gloves with the person he saw open Mr. Hilliard's door, had no probative value, were irrelevant, and should not have been admitted.[4] Appellant further argues that the implication of Officer Simic's testimony was that Officer Simic could identify appellant as the burglar who opened the door in part because appellant was later in possession of the "same gloves" that man had worn, something Officer Simic could have known only

---

[4] The record is somewhat mixed regarding whether appellant preserved his objection to the claimed erroneous admission of the gloves. At one point, appellant's counsel's objection led the court to admit the gloves "subject to connection." Counsel later objected "[s]ubject to cross-examination," but then did not conduct a cross-examination that raised anew the "connection" issue. Counsel did object during the government's closing argument when the prosecutor emphasized that Officer Simic "saw the gloves" admitted as Exhibit 31. And, after the prosecutor's closing argument and before the physical evidence went back to the jury, counsel objected that the gloves had never been connected to appellant. On this record, appellant's claim that the gloves were erroneously admitted into evidence is at least arguably subject to plain error review. The government does not urge us to apply the plain error standard, however (arguing instead that the trial court did not abuse its discretion in admitting the gloves), and, therefore, in evaluating the impact of erroneously admitted evidence, we shall apply the *Kotteakos* standard. *See Lazo v. United States*, 930 A.2d 183, 189 (D.C. 2007) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Under that standard, "which requires us to examine the prejudicial effect of the erroneously admitted evidence in relation to the strength of the government's case," *id.*, "reversal is not warranted if we determine, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Jones v. United States*, 17 A.3d 628, 634 (D.C. 2011) (quoting *Kotteakos*, 328 U.S. at 765).

through the (testimonial hearsay) statement of Officer Higginbotham or whichever other MPD employee recovered the gloves. Thus, appellant argues, the "admission of the gloves necessarily included the implied hearsay statement that the gloves were found on Mr. Smith."[5]

While "'[t]he trial court has broad discretion in determining the admissibility of physical evidence,'" *Fleming v. United* States, 923 A.2d 830, 836 (D.C. 2007) (quoting *Gilmore v. United States*, 742 A.2d 862, 871 (D.C. 1999)), the legal requirement for admission of physical evidence is "some connection with the accused or the crime." *Burleson v. United States*, 306 A.2d 659, 661 (D.C. 1973). We have stated repeatedly that a missing link in the chain of custody of physical evidence "affect[s] only the weight to be given to the evidence, not its admissibility." *See, e.g.*, *Garcia v. United States*, 897 A.2d 796, 801 (D.C. 2006). Importantly, however, it appears that we have applied that principle only in cases where there is testimony that the item of physical evidence was found in the

---

[5] Appellant cites *Young v. United States*, 63 A.3d 1033, 1045 (D.C. 2013) (recognizing that where DNA analyst "was not personally involved in the process that generated [DNA] profiles" and "had no personal knowledge of how or from what sources the profiles were produced," her testimony that she matched a DNA profile derived from appellant's buccal swab with male DNA profiles derived from the sexual assault victim would have been "meaningless" absent her unspoken reliance on "out-of-court assertions by absent lab technicians . . . [about how] they derived the profiles").

defendant's (actual or constructive) possession. *See, e.g.*, *In re D.S.*, 747 A.2d 1182, 1187-88 (D.C. 2000) (finding no error in admission of weapon despite an alleged break in the chain of custody because the defendant failed to rebut the presumption that the weapon admitted into evidence was the weapon taken from him, but doing so only after noting testimony by one Officer Key "that the weapon admitted into evidence at trial was the weapon [police] recovered from [the defendant] the night he was placed under arrest").

In the instant case, Officer Hernandez testified that appellant was not wearing gloves at the time he was apprehended, no gloves were found around where appellant was apprehended even though Officer Hernandez searched the area, and there was no testimony that the black gloves admitted into evidence as Government Exhibit 31 were otherwise found in appellant's possession. Officer Simic testified that he received the gloves from Officer Higginbotham at the police station, and Officer Hernandez testified that he received the gloves from Officer Simic and "placed them on the property [book]," but Officer Higginbotham did not testify and thus did not provide trial evidence (nor did anyone else testify at trial) that the gloves were found during a search of appellant. Officer Simic — who acknowledged on cross-examination that there was nothing unusual about the gloves he saw when the man with dreads opened the door — testified that the

gloves admitted as Exhibit 31 were the very same gloves worn by the man with dreads, so the officer did connect the generic black gloves to the crime (albeit weakly). But because the identity of the man with dreads was in dispute, Officer Simic's testimony about the gloves did not connect appellant to the crime in the way the testimony would have done had there also been evidence that the gloves were found in appellant's possession. More particularly, the gloves did not tie appellant to the dreadlocked burglar whom Officer Simic saw standing in the doorway of Mr. Hilliard's apartment.

Thus, the issue here is the source of the gloves – i.e., how the police came to have custody of the gloves – rather than a missing link in their chain of custody. Further, the problem is not merely, as the government suggests, that Officer Simic failed to describe how he could recognize the generic black gloves as the ones the man with dreadlocks wore or the ones Officer Higginbotham gave him. The problem is more fundamental: without testimony that the gloves were found in appellant's possession, the fact that they were the gloves worn by the man with dreads was irrelevant to the issue of whether appellant was one of the burglars. Because the disputed issue was not whether the man with the dreads was wearing black gloves but whether appellant was that man, introduction of the gloves was "likely to have a damaging impact on the jury." *Burleson*, 306 A.2d at 662

(warning of the "general mental tendency, when a corporal object is produced as proving something, to assume, on sight of the object, all else that is implied in the case about it" (internal quotation marks omitted)). With the admission of the gloves, the jury would have a tendency to believe not only that these were the gloves the man with dreads wore, but also that appellant was that man, even though there was no evidence that the gloves were found in his possession. *Cf. id.* at 661-62 (reasoning that where "the disputed and only issue" was whether the defendant used a gun during an assault, admission of a gun that a witness said he was "reasonably sure" was the weapon the defendant brandished during an assault but that was not found in defendant's possession created tendency for the jury "to believe . . . that the accused did in fact use a gun"; reversing the defendant's conviction because the "connection [of the gun] with appellant was too conjectural and remote" and its admission constituted reversible error).

In short, in the absence of evidence about how Officer Higginbotham came to have the gloves or where he found them, the problem here is that any connection between appellant and the gloves is conjectural. And, given that the identity of the man with dreads was a central disputed issue (and the fact that the complainant could not or would not identify appellant as the man with dreads and also testified than the man was taller than appellant), we cannot say that the admission of the

gloves was harmless error. To the contrary, admission of the gloves may have caused the jury to believe what the government's introduction of the gloves implied: that the fact that the gloves were in the government's custody corroborated Officer Simic's testimony that appellant was the man with the dreads and thus one of the burglars.

There was in this case what appellant's trial counsel referred to as a "severe identification issue." Although reluctant-complainant Hilliard's testimony — to the effect that appellant was not the man with dreads — was perhaps easily written off by the jury as reflecting Mr. Hilliard's fear of identifying appellant, we think it likely that Mr. Hilliard's testimony that the man with the dreads was much taller than Mr. Hilliard (and, by implication, much taller than appellant) was not quite so easily discounted as the jury considered appellant's misidentification defense. And, notwithstanding testimony by officers that appellant was the man seen in the apartment, jumping out of the apartment window, or running away after that jump[6]

---

[6] Officer Simic clearly identified appellant as the man he saw open Mr. Hilliard's door, but the other officers' identifications were more ambiguous or confusing. Officer Hernandez testified that he saw a man jump out of the window, but he never testified that he recognized that man. Instead, when asked "Who was the young man who jumped out of the window?," he replied, "He was later identified as Joseph Smith." And, as described above, Officer Ellis initially gave a narrative in which she saw Mr. Roberson but not appellant jump out of a window.

(continued…)

and evidence that appellant was found with several items taken from Mr. Hilliard's apartment,[7] the prosecutor deemed it necessary in closing argument to shore up that testimony by emphasizing that Officer Simic "got a good look at" appellant's hands and "told you that these gloves in Government's Exhibit 31 were on [appellant's] hands." We have observed repeatedly that "[a] prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial." *Gathers v. United States*, 101 A.3d 1004, 1009 (D.C. 2014) (internal quotation marks imitted). Here, the prosecutor's emphasis on the gloves leaves us unable to say with assurance that the erroneous admission of the black gloves that had not been connected to appellant was harmless.[8]

At oral argument, the government emphasized that the jury was unable to reach a verdict with respect to appellant's co-defendant Roberson, the man officers

_____

(…continued)

[7] We note, too, that the jury could not reach a verdict as to appellant's co-defendant Roberson, who, the evidence showed, dropped Mr. Hilliard's mini-speakers just before he was apprehended, who was "found with a ski mask," and whom "multiple officers saw . . . jump from the [apartment] window."

[8] We also note that the trial court's comments at sentencing appear to reflect the court's assessment that the government's case was not overwhelming. The court remarked, "[A]ll of us sat through the trial. But the jury decided what the jury decided. And I'm not going to go behind the jury's verdict."

testified was the first to jump out of the apartment window, even though Roberson admitted that he was wearing gloves when he was arrested and stipulated that gloves admitted as Government Exhibit 30 were recovered from him. Thus, the government suggested, the sets of gloves were not such compelling evidence that improper admission of the Exhibit 31 gloves should be considered prejudicial error. We cannot agree. Unlike with appellant, no officer testified to seeing Roberson in the apartment, or to seeing gloves on him while he was fleeing from the apartment, and thus the relevance of the gloves found on him was as a tool of the burglar trade, so to speak, rather than as corroborative of identity. It was otherwise with respect to the black gloves admitted as Government Exhibit 31. Those gloves were offered as corroborative of appellant's identity as the burglar who opened the door to Officer Simic.

For the foregoing reasons, we conclude that appellant is entitled to reversal of his convictions. As we did in *Burleson*, we reverse and remand for new trial.[9]

---

[9] In light of this disposition, we do not address at length appellant's argument that admission of the gloves amounted to admission of (implied) hearsay and to the admission of testimonial hearsay (the implication being that there was on an out-of-court declaration to Officer Simic about the recovery of the gloves from appellant's person, made with the primary purpose of amassing evidence for trial), in violation of appellant's rights under the Confrontation Clause. The government contends that there was no implicit assertion that the gloves were taken from appellant, but does not suggest that if there was implied hearsay, it fell

(continued…)

**IV.**

We briefly address another of appellant's arguments in case it should arise

on re-trial.[10]  Appellant contends that it was error for the court to "refuse[] to give

_____

(…continued)
within any hearsay exception or its admission would not violate appellant's rights under the Confrontation Clause.

It seems unlikely to us that the jury missed the implication that the gloves were taken from appellant.  Further, it seems fair to say either that the testimony about the gloves did rely on (implied) testimonial hearsay (that supplied the missing connection between the gloves and appellant) and was admitted in violation of the Confrontation Clause, *cf. Young v. United States*, 63 A.3d 1033 (D.C. 2013), or that the testimony was irrelevant and prejudicial (as we have concluded in the text above).

[10]  We need not resolve appellant's contention that it was error to admit Officer Simic's testimony about what Mr. Hilliard told Officer Simic when the officer asked him what had happened.  The government argues that Officer Simic's testimony about what Mr. Hilliard said was not hearsay, and was properly admitted, because it conveyed admissible identification testimony and excited utterances by Mr. Hilliard, who, at the time he spoke to Officer Simic, was "exhausted," "breathing very heavily," "holding himself to a chair," and "bleeding from the mouth" from being hit by one of the intruders — i.e., still feeling the physical and emotional effects of the burglary.  The government also argues that the  statements were elicited while Officer Simic was confronted with and responding to an ongoing emergency.  If Officer Simic testifies at a new trial, the trial court will have the opportunity in the first instance to determine whether his testimony is admissible as non-hearsay or should be excluded as testimonial hearsay.  *See Michigan v. Bryant*, 562 U.S. 344, 365 (2011) ("Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude 'the portions of any statement that have become testimonial[.]'" (footnote omitted) (quoting *Davis v. Washington*, 547 U.S. 813, 829 (2006)); *Simmons v. United States*, 945 A.2d 1183, 1187 (D.C. 2008) (noting

(continued…)

[his] proposed defense theory instruction" regarding "how he came to have Mr. Hilliard's property on him when he was arrested."[11] Appellant proposed a three-paragraph defense theory instruction:

(…continued)

that a decision to admit or exclude a proffered out-of-court statement as an excited utterance is "committed in the first instance to the discretionary judgment of the trial judge").

We also need not discuss at length appellant's argument that the trial court erred in allowing the prosecutor to make "improper and highly prejudicial" statements during closing argument to the effect that appellant's presence during the testimony of the government's witnesses gave him an opportunity to tailor his testimony, even though the prosecutor "could point to nothing specific that Mr. Smith did to tailor his testimony." As appellant acknowledges, the Supreme Court's holding in *Portuondo v. Agard*, 529 U.S. 61 (2000), "[a]llow[s] comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate . . . to the central function of the trial, which is to discover the truth." *Id.* at 73; *see also Teoume-Lessane v. United States*, 931 A.2d 478, 494-95 (D.C. 2007) (recognizing that *Portuondo* overruled this court's previous determination in *Jenkins v. United States*, 374 A.2d 581 (D.C. 1977), in which this court held that a defendant's Sixth Amendment confrontation rights, which include the right to listen to the testimony of all other witnesses before testifying, includes "the right to testify without the prosecutor commenting on the effect these circumstances have on the defendant's credibility as a witness"; and noting that "the Constitution would allow such comments even without specific indications of tailoring"). We specifically declined in *Teoume-Lessane* "to exercise our supervisory authority to prohibit the government from commenting on a defendant's ability to tailor his own testimony to the evidence," emphasizing that "this court's supervisory authority is to be sparingly exercised." 931 A.2d at 494 (internal quotation marks omitted).

[11] "A defendant is entitled to instructions that 'fairly and fully' present his theory of the case 'when properly requested by counsel and when . . . supported by [some] evidence.'" *Williams v. United States*, 6 A.3d 843, 845 (D.C. 2010) (quoting *Stack v. United States*, 519 A.2d 147, 154-55 (D.C. 1986)).

Joseph Smith denies being in the apartment of Mr. Hilliard on the evening of January 27th, 2013; and accordingly, denies committing any of the offenses charged against him; this is, first-degree, burglary, robbery, kidnapping, and threats.

It is further Joseph Smith's defense that the officers were mistaken in the identification of Mr. Smith as the person who opened the door of Mr. Hilliard's apartment on January 27th, 2013, and who jumped from the window of that apartment.

It is Joseph Smith's defense that he picked up from the ground outside of Mr. Hilliard's apartment window property that was dropped or discarded by an unknown person who jumped from Mr. Hilliard's window and who then began running away before the police arrived.

The government argued that the third paragraph of this instruction would "give[] improper weight to [appellant's] testimony." The trial court omitted the third paragraph, finding that it was not "appropriate."

Appellant was charged with burglary, kidnapping, robbery, and threatening to kidnap or injure a person. Although the government presented evidence and argued that appellant was one of the burglars actually inside Mr. Hilliard's apartment — i.e., a principal, not a mere aider and abettor — the court gave the jury an aiding and abetting instruction, telling them that, for conviction, it was "not necessary [for the jury to] find that the defendant was actually present while the crime was committed." With that instruction given, a defense-theory instruction

that conveyed only appellant's general denial that he was in the apartment and his theory that police misidentified him as the man who was seen in the apartment by Officer Simic and was seen by officers jumping from the apartment window (defense theories adequately conveyed through the first two paragraphs of the instruction quoted above) may not have been enough to honor appellant's constitutional right to present a defense to aiding and abetting the burglars' crimes. With only the instruction conveyed by the first two paragraphs quoted above, there was a "risk that the jury might find [appellant] guilty [on an aiding and abetting theory] although believing his testimony [that he was never in Mr. Hilliard's apartment and was not the man seen jumping from the window]." *Laughlin v. United States*, 385 F.2d 287, 294 (D.C. Cir. 1967).

The trial court is not required to "rehearse the evidence" or to "give special emphasis to the defendant's testimony," *id.*, and is not required to instruct the jury "in the exact language" a defendant requests. *Stack*, 519 A.2d at 154. However, with the court having given the jury an aiding and abetting instruction, we think it was error for the court to decline to give, with any modifications the court deemed appropriate, *see id.* at 156, an instruction conveying the defense theory that the man who jumped out of the window with the items later found on appellant's

person was "unknown" to appellant (and thus not a fellow participant or associate in the charged crimes).

The judgments of conviction are reversed and the case is remanded for a new trial.

*So ordered.*

FARRELL, *Senior Judge*, concurring in part and dissenting in part:    I agree with the court that the gloves admitted in evidence did not pass the test of relevance.  But, unlike my colleagues, I am not convinced that the gloves and the accompanying testimony by Officer Simic about the gloves had any material effect on the jury's verdict.  The combined identifications of appellant as someone who jumped out of the window of the victim's apartment was very strong; appellant explained his capture minutes later with the victim's property in his pocket by a story that taxed the credulity of any reasonable juror; and the glove evidence ultimately played a minimal part in the prosecutor's argument of the case to the jury.

First, as to the glove testimony.  Officer Simic did indeed testify, without adequate foundation, that the gloves introduced in evidence were those appellant had been wearing when he opened the door in response to Simic's knock.  But in his opening summation the prosecutor devoted only five sentences of some thirty transcript pages of argument to the gloves, and appellant's counsel in response suggested why:

> [Simic] gave a description of someone with gloves.  Who else said that?  Absolutely, no one.  Mr. Smith, upon arrest, [had] no gloves.  The government says, well, . . . these are the gloves [in Govt. Exhibit 31, a photograph]; [w]here did that come from?  The officers that arrested Mr. Smith . . . [and] searched Mr. Smith, they didn't say anything about recovering gloves from [him].  You never heard any evidence of where this . . . pair of gloves came from.

Unsurprisingly, in his rebuttal argument the prosecutor did not mention the gloves again.

Far from depending on the (incredible shrinking) evidence of the gloves, the government's case was built on the identification of appellant by three officers as one of the men each saw jump from the victim's apartment window, after which appellant fled down Good Hope Road before he was found hiding and in possession of the victim's wallet and other personal property.  Simic, from eight or

nine yards away, saw appellant, wearing dreadlocks, hunched over in the window before he jumped and started running down Good Hope Road. Officer Ellis likewise saw appellant, "the man with the dreads," crouch and jump from the window and begin running after she yelled to him not to. She "had [her] eyes on [appellant] until [she] saw" Officer Hernandez take up the chase. Ellis, as the court notes, initially confused appellant with codefendant Roberson in court and claimed not to see him there, but she soon corrected herself ("He is here. I'm sorry. I didn't see him") and unequivocally identified appellant, "sitting there . . . with the long dreadlocks," as the man she had seen jump from the window and run down Good Hope Road.

Lastly, Officer Hernandez heard Ellis yell "don't jump," then saw appellant jump from the window and run down Good Hope Road. Hernandez pursued him in his vehicle, then alighted and chased him on foot down an embankment, where appellant was found hiding in the woods with the victim's possessions. My colleagues assert that Hernandez never actually said that appellant and the man who jumped were the same, only that he later learned of that fact (appellant "was later identified as Joseph Smith.") But regardless of when Hernandez learned appellant's *name*, no one hearing his testimony as a whole would have reasonably doubted that in his mind appellant, "wearing . . . dreads in the back and . . . a red

striped shirt" in court, was the same person Hernandez identified from on-scene arrest photos as the man he had chased and caught after watching him jump from the window and run.

As the court points out, the jury could also credit a fourth officer's testimony that appellant, in the squad car, admitted that "we" — he and others — had jumped out of the window of the victim's apartment. But, of course, appellant told a different story at trial about how he was caught seemingly red-handed with the victim's property. As he was walking home from a store, a stranger inside a nearby building asked his help in hoisting a TV out of a window (a window some nine feet above ground). Appellant agreed to, but then the man suddenly jumped out of the window, dropping some items as he did, and ran away. Appellant picked up and pocketed the items, including a wallet and an MP3 player, and when he saw a police car approach he ran and eventually hid in the woods. Appellant could offer no description of the man who jumped and ran, nor did he explain why he fled the police and hid or what he intended to do with the pocketed items. They were, as his lawyer imagined his thinking in closing argument, "good and valuable stuff"; "I'll take it. Why not?" Appellant's counsel, in characterizing the government's case to the jury, might well have been commenting on appellant's own story: "it sounds a little bit crazy."

For all of these reasons, I see no reasonable, realistic possibility that the jury was influenced by the glove evidence in finding appellant guilty, under whichever standard of review the court applies. *See ante* at [10] n.4. I reach the same conclusion of no prejudice as to appellant's other assignments of error as well.